[No. 30525. Department Two. September 7, 1948.]

MARIE C. WALSH, *as Administratrix, Respondent,* v.
WEST COAST COAL MINES, INC., *Appellant.*[1]

[1]Reported in 197 P. (2d) 233.

398

*Walter Scott Acheson* and *George Eldon Smith,* for appellant.

*Henry W. Parrott* and *Bassett & Geisness,* for respondent.

STEINERT, J.—Plaintiff, as administratrix, brought this action on behalf of herself and her minor children to recover damages for the death of her husband, resulting from an accident which occurred in defendant's coal mine, and which she alleged was caused by defendant's negligence. In its answer, defendant denied plaintiff's allegations of negligence and, by way of three affirmative defenses, alleged (1) that the deceased was a mere volunteer on its premises at the time he was killed, and that the dangerous conditions then and there existing were fully known to and appreciated by him; (2) that his death was caused by his contributory negligence; and (3) that he voluntarily assumed the risks incident to his presence upon the premises under the existing conditions. Plaintiff demurred to the third affirmative defense. The trial court sustained the demurrer as to the categorical allegation of assumption of risk by the deceased, but overruled the demurrer as to the remainder of the pleaded defense, allowing the facts therein stated to stand as a plea of contributory negligence.

The cause was tried to a jury, and, at the conclusion of all the evidence, defendant moved for a directed verdict in its favor. The motion was denied, and the cause was submitted to the jury, which returned a verdict for plaintiff. Defendant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial was denied, and judgment was thereupon entered on the verdict. Defendant appealed.

The facts with reference to the accident which resulted in the death of the deceased are as follows: Appellant, West Coast Coal Mines, Inc., a corporation, owned and operated a coal mine, known as the Glen Echo mine, situated near Bellingham, in Whatcom county. The operation of the mine was conducted under the general supervision and management of appellant's president, Joseph A. Jussel. The company employed as foreman one Gomer Owens, who had direct charge of the work done in and about the mine. The deceased, Walter H. Walsh, at and prior to the time of his death, was a Federal coal mine inspector of the United States bureau of mines. His duties involved the inspection of coal mines, observing and reporting hazardous conditions therein, and recommending safety measures. His territory covered three states, including Washington. Respondent, Marie C. Walsh, is the widow of the deceased and the mother of his seven children, six of whom were minors at the times involved in this action.

Sometime prior to June 30, 1945, it became apparent to the appellant company that, in order to continue its mining operations at the Glen Echo mine, it would be necessary to recondition the main slope, or opening into the mine. It appears that, at a point approximately forty feet within the portal, or entrance into the mine, the supporting timbers had become decayed and were being squeezed inward toward the center of the main slope. This so narrowed the width of the passageway that appellant's coal cars, which ran along a track on the floor of this slope, were scraping against and cutting into the timbers and, by reason thereof, were barely able to pass that point. Appellant, through its officers, therefore decided to remove these old timbers, widen the passageway, and then re-enforce the slope with new timbers and concrete.

Under the direction of its foreman, Gomer Owens, appellant commenced these repairs by pulling out the old timbers with a hoist, but without first providing the slope with any temporary support, such as forepoling, raising the lagging, or putting in some other kind of sustaining prop, until the permanent support could be set in place.

The removal of the old timbers and the absence of any temporary supports weakened the main slope to such an extent that, on June 30 or July 1, 1945, a "cave-in" of dirt, debris, and muck occurred about forty feet from the portal, at the place where the old timbers had been removed, thereby blocking the passageway of the slope. As it was necessary to remove the matter that had thus caved in before the reconditioning work could continue, appellant set about removing this mass of debris.

One of the problems involved in digging out a cave-in occurring in a mine is that of preventing the fall of other and further debris after the original matter has been removed from the site where the cave-in occurred. As such new matter usually proceeds from the roof, or top, of the slope, a standard method of control and support is to brace the roof at one end of the accumulated debris; as the debris is then cleared away at this and successive points, the brace above is extended forward progressively until the entire slope is completely cleared of the obstruction. This method, known as forepoling, prevents further cave-ins and sustains the roof of the slope until permanent supports can be set in place.

Appellant's foreman attempted to forepole through the mass of fallen debris which blocked the slope. He first tried to forepole with timbers, and then with steel rails. His attempts proved unsuccessful, however, although experts testified that, had the work been done in a proper manner, it would have been successful and would have prevented further debris from falling into the slope.

Appellant thereupon concluded to remove the clogging matter by excavating the earth from the ground surface above the mine down to and through the obstructed slope. To accomplish this end, a clamshell, dirt-removing machine was employed. By this method, appellant was able to dig downward from the top and eventually remove the muck and debris that had fallen into the main slope. This operation, however, left a conical-shaped hole, about seventy-five feet deep, extending from the surface of the ground above the mine to the roof of the slope below. This hole

was about sixteen feet by twenty feet in size at the top where it met the ground surface, and about eight feet by ten feet at the bottom where it entered the slope. The sides were almost vertical and were allowed by appellant to remain in that condition. Overhanging trees, dirt, and debris were also left, and allowed to remain, around and about the top of the hole.

Expert witnesses testified that these conditions were very dangerous, and that proper safety procedure required that the sides of the hole be cut back to an angle of about forty-five degrees, or the angle of repose, and that the sides then be timbered. Appellant did dynamite parts of the overhang, but not sufficiently to change the situation materially.

This excavation having been completed and the debris from the bottom of the slope having been cleared away, appellant set about constructing a steel mat, or lacework, which was to be laid flat at the lower end of the hole, above the roof of the slope, and covered with timbers and dirt. The purpose of this mat was to act as a stopper, or plug, to prevent dirt and other foreign matter from entering the main slope through the hole above it. The mat was about twelve feet by fifteen feet in size and was constructed of sixty-pound steel rails placed lengthwise and sixteen-pound steel rails spot-welded crosswise, forming a web, and three-inch planking placed between and upon the rails. The steel rails were obtained from a junk yard.

The idea of the construction and use of this mat was obtained by Owens, the foreman, from a study of various publications issued by the bureau of mines and other similar authorities. The evidence indicates that some of the rails used by appellant in constructing the mat had become crystallized, although this fact was not obvious upon ocular examination. When the mat was completed, it was to be put in place by resting it upon hitches, or notches, cut into the sides, or walls, of the hole.

On the evening of July 19, 1945, which was about nineteen days after the cave-in above described, Walter H. Walsh, now deceased, having heard of that occurrence, visited the Glen Echo mine, in company with Charles B. Jacobs, a

safety inspector for the state department of labor and industries. The evidence discloses, without dispute, that Mr. Walsh was a very fine coal mine inspector, had had over thirty years of experience in coal mining operations, and had held responsible positions involving coal mine inspection in various parts of the country.

Upon arrival at the coal mine, Walsh and Jacobs consulted with Jussel, appellant's president, and Owens, its foreman, and then proceeded to inspect the premises, including the main slope, the conical-shaped hole above it, the top and the side walls of the hole, and, in general, the work that had been done as heretofore described.

.At this time, the work of excavating the hole had been completed, the slope below had been cleared, and appellant's employees were engaged in constructing the mat and cutting the hitches into which it was to be placed. It was raining at the time the inspection was being made, and the two inspectors observed that water was running down along one of the walls of the hole onto the floor of the slope, and that chunks of sloughage of from eight to twelve pounds in weight were continuously dropping down the side of the wall from a point twenty-five or thirty feet above the lower end of the hole. Upon inquiry, they were told that an old mining prospect shaft, full of water, was located further up the hill, from which it was surmised that the water was being fed into the excavated hole.

At the trial, Jacobs testified that, during their inspection of the premises, both he and Walsh were of the opinion, as then expressed to each other, that the preparations which were being made by appellant were inadequate; that it was quite evident that appellant's employees were unfamiliar with the work they were doing and that none of them "really knew their stuff"; that the situation and conditions surrounding the hole were extremely dangerous; and that a second slide or cave-in, at the point where the water was running down the side wall, was imminent. Mr. Walsh at that time expressed the opinion, in which Jacobs concurred, that the steel mat which appellant's employees were constructing was all "haywire" and that if the rails were

crystallized "they would break like matches," in the event of a slide. These various views, as entertained and expressed by Walsh and Jacobs, were concurred in by experts who examined the area after the accident and testified at the trial. Walsh apparently did not disclose these views to appellant or its employees, presumably because, as heretofore stated, he, as a coal mine inspector, had only the power to recommend, and not the power to enforce, his ideas regarding safety measures.

On July 20, 1945, the day following the above inspection, Walsh returned to the mine about eight o'clock in the evening and thereupon inspected the work that had been done since his visit the day before. At this time, the mat had been set in place, and timbers, which Walsh on his first visit had suggested should be used in shoring up the walls of the conical-shaped hole, had been set in position. Aside from these additions, the situation in and around the mine was the same as it had been the day before.

Expert witnesses testified that this situation as it existed on the evening of July 20th was very dangerous, because of the water seepage from the wall on one side of the hole, the overhanging trees, dirt, and other matter at the top of the hole, and the almost vertical slope of the walls of the hole itself. They testified that, under these conditions, a second slide was imminent, that the roof of the slope was insufficiently supported, and that the hitches on which the mat was allowed to rest did not constitute a satisfactory method of installing the mat. Although some of the experts visited the mine for the first time after the accident, their opinions are relevant, inasmuch as the evidence clearly indicates that the situation prior to Walsh's death was the same as that which obtained thereafter, except that in the meantime a slide had occurred in the hole.

Upon his arrival at the mine on the night of July 20th, Walsh looked over the work which the men were then performing within the slope and discussed with Owens the procedure to be followed. In that discussion, Walsh said to Owens:

"Gomer, I don't want you to think that I am trying to butt in or tell you how to do this, but I thought the boys needed some help and I promised to come over here and assist you in getting this timbering done, and I don't want you to think that I am trying to butt in or interfere with your work."

Owens replied that he was only too glad to have that help. Walsh thereupon entered the main slope and began working with Owens and three other employees in placing timber supports underneath the mat.

About eleven-thirty p.m. Owens, who had become physically exhausted, left the mine and went to his cabin nearby to get some sleep. Walsh volunteered to remain and help the employees with their work. From that time on, it appears that the three employees who remained on the job acquiesced in any suggestions which Walsh made relative to the installation of the mat and its support.

Thereafter, Walsh and the three employees proceeded with the work inside the mine. Upon a few occasions, one or two of the employees went outside to procure certain materials, but with these exceptions no one observed, or was stationed upon or near, the ground around the excavated hole. Although one witness testified that, in view of the existing conditions, standard safety procedure called for the posting of a "lookout" at that location for the purpose of giving warning to persons in the mine of any indications of an impending slide, the fact is that no such lookout was posted, and it is indubitable from the evidence that Walsh, though continuing with his work beneath the mat, was aware of the absence of any posted lookout.

At about one o'clock in the morning of July 21, 1945, while Walsh was working on a ladder directly beneath the steel mat, a second slide or cave-in occurred, coming without warning. Approximately five hundred tons of rock and mud dropped through the hole, crushing the mat and instantly killing Walsh and one of the company's employees. Their bodies were recovered the next day.

The theory upon which respondent brought this action is that the death of Walter H. Walsh was the result of

appellant's alleged negligence in (1) removing the timbers within the main slope in such a manner as to cause the first cave-in, (2) creating the conditions which precipitated the second cave-in, and (3) failing to provide proper protection against the slide which caused the death of the deceased.

Appellant has raised a number of questions on the appeal, but its principal assignment of error, and the one we shall first consider, is the ruling of the trial court denying appellant's motion for a directed verdict made at the conclusion of all the evidence. In considering this question, we have in mind the well-established rule that a motion for a directed verdict admits the truth of the evidence of the party against whom the motion is made and of all inferences that reasonably can be drawn from such evidence, and requires that the evidence as a whole be interpreted most strongly against the moving party and in the light most favorable to the opposing party. *Bleyhl v. Tea Garden Products Co.*, 30 Wn. (2d) 447, 191 P. (2d) 851, and cases cited therein.

Appellant contends that the trial court erred in refusing to grant its motion for directed verdict, for the reasons set forth in, and constituting, its three affirmative defenses as hereinabove enumerated. As previously stated herein, the trial court sustained respondent's demurrer to appellant's third affirmative defense in so far as that defense alleged that the deceased "voluntarily assumed the risk incident" to his going underneath the steel mat, but overruled the demurrer as to the remainder of that defense and permitted the allegations of fact stated therein to stand as a plea of contributory negligence.

In order to determine whether the facts of the instant case, viewed in the light of the introductory rule stated above, are sufficient to establish any one or more of appellant's three affirmative defenses and thereby sustain its contention on the matter of its request for a directed verdict, it will be of advantage to consider the nature of those defenses as they exist in this jurisdiction, and as they may be found applicable to the facts in this case.

The defenses which appellant pleaded and upon which it now relies are, strictly speaking, three separate and distinct defenses, each of which, by itself, under proper circumstances, may be a good defense where the liability of a defendant is predicated upon his negligence. These defenses, which for convenience we will discuss in the following order, are (1) assumption of risk, (2) the principle involved in the maxim *volenti non fit injuria*, and (3) contributory negligence.

While the courts do not always emphasize the individuality and differentiating characteristics of these respective defenses, as compared with each other, and at times are prone to employ these various terms indiscriminately and interchangeably, there is a clear distinction between the defenses of assumption of risk and *volenti non fit injuria*, on the one hand, and the defense of contributory negligence, on the other; there is also some difference in nature between the defense of assumption of risk and that embodied in the Latin maxim. All three of these defenses are nevertheless closely associated, often shading into each other, and approximating the same result, namely, to preclude, in a proper case, recovery by the plaintiff against the defendant in an action arising out of injury to persons or property. Much of the confusion with respect to these defenses arises from the similarity of situations to which they are applicable, and because the result of all three is the same.

The doctrine of assumption of risk, as usually set forth and generally understood, is that one who, as servant or employee, enters into the service of another assumes by his very contract of employment the risk of all dangers ordinarily incident to the work upon which he engages. *Goddard v. Interstate Tel. Co.*, 56 Wash. 536, 106 Pac. 188; *Acres v. Frederick & Nelson*, 79 Wash. 402, 140 Pac. 370; *Griffith v. Washington Water Power Co.*, 102 Wash. 78, 172 Pac. 822, affirmed on rehearing, 104 Wash. 694, 176 Pac. 343; *Lander v. Shannon*, 148 Wash. 93, 268 Pac. 145; *McGinn v. North Coast Stevedoring Co.*, 149 Wash. 1, 270 Pac. 113; *Cummins v. Dufault*, 18 Wn. (2d) 274, 139 P. (2d) 308; 35

Am. Jur. 716, Master & Servant, § 293; Harper, Torts, 289, § 130. In some of the cases above cited, it is also declared that a servant assumes the extraordinary risks of his employment if they are open and apparent, although due directly to the master's negligence.

■ The ancient maxim *volenti non fit injuria* means "That to which a person assents is not esteemed in law an injury." See 44 Words and Phrases (Perm. ed.) 368, and 1948 Cumulative Annual Pocket Part 67; 38 Am. Jur. 845, Negligence, § 171; 67 C. J. 270, Volenti Non Fit Injuria. As stated in *Gover v. Central Vermont R. Co.*, 96 Vt. 208, 118 Atl. 874, the principle underlying the maxim is:

"If one knowing and comprehending the danger voluntarily exposes himself to it, though not negligent in so doing, he is deemed to have assumed the risk and is precluded from a recovery for an injury resulting therefrom. The maxim is predicated upon the theory of knowledge and appreciation of the danger and voluntary assent thereto."

To the same effect, see *Fitzgerald v. Connecticut River Paper Co.*, 155 Mass. 155, 29 N. E. 464, 31 Am. St. 537; *O'Maley v. South Boston Gas & Light Co.*, 158 Mass. 135, 32 N. E. 1119, 47 L. R. A. 161; *Edwards v. Kirk*, 227 Iowa 684, 288 N. W. 875; *Landrum v. Roddy*, 143 Neb. 934, 12 N. W. (2d) 82, 149 A. L. R. 1041.

■ Contributory negligence, as defined by this court, consists of some act or omission on the part of the injured person which caused or contributed to cause the injury, and which was not such as would have been done or omitted by a person exercising ordinary prudence under the circumstances. *Hynek v. Seattle*, 7 Wn. (2d) 386, 111 P. (2d) 247.

The *Hynek* case quoted the definition of contributory negligence, given in Restatement of the Law, Torts, 1227, § 463, as follows:

" 'Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection and which is a legally contributing cause, co-operating with the negligence of the defendant in bringing about the plaintiff's harm.' "

■ The distinction between the doctrine of assumption of risk and the principle involved in the maxim *volenti non fit injuria,* as applied by the courts, is that the "doctrine" applies only to cases arising out of the relationship of master and servant, or at least to cases involving a contractual relationship, whereas the "maxim" applies, in proper cases, independently of any contract relation.

As stated in *Gover v. Central Vermont R. Co., supra,*

"In the primary and narrower sense the doctrine [assumption of risk] can apply only when a contractual relation exists, ordinarily that of master and servant. But in the broader sense it may apply when no relation by contract exists within the limits of the maxim *'volenti non fit injuria.'* "

However, the general theory underlying both the doctrine and the maxim referred to above is the same; and this court, as well as courts generally, have used both terms as referring to the same thing in cases where knowledge by an injured party of an obvious danger is involved. In the recent case of *Caron v. Grays Harbor County,* 18 Wn. (2d) 397, 139 P. (2d) 626, 148 A. L. R. 626, where that subject was under consideration, we said:

"While the relation of master and servant offers the most conspicuous example of situations involving the doctrine of assumption of risk, it is by no means the only relation to which the doctrine may be applicable. As stated in Harper on Torts, 290, § 130:

" 'The doctrine of voluntary assumption is a crystallization of the idea expressed in the latin maxim *volenti non fit injuria* and was thought for a time to be applicable only to situations arising out of the relationship of master and servant, as an implied term of the contract. It is clear, however, that it is "implied" by the law and not by the contract, and by reason of the relation between the parties. It thus is applicable to voluntary relations other than those of employer and employee.'

"Whether the one term or the other be used, they both have reference to the same thing in cases where knowledge by the injured party of an obvious danger is involved. In the following cases, the general principle above stated was applied as a bar to recovery by invitees: *Hogan v. Metropolitan Bldg. Co., supra* [120 Wash. 82, 206 Pac. 959]; *Viles v.*

*Thunborg,* 164 Wash. 190, 2 P. (2d) 666; *Juntila v. Everett School Dist. No. 24, supra* [183 Wash. 357, 48 P. (2d) 613]. Among the many cases which applied the same general principle to the relationship of master and servant, though designating the principle as assumption of risk, are the following: *Snyder v. Lamb-Davis Lbr. Co.,* 64 Wash. 587, 117 Pac. 399; *Dahl v. Puget Sound Iron & Steel Works,* 77 Wash. 126, 137 Pac. 315; *Brandon v. Globe Inv. Co.,* 108 Wash. 360, 184 Pac. 325, 10 A. L. R. 286; *Jones v. Baker,* 179 Wash. 25, 35 P. (2d) 1103; *Freeman v. Smit,* 193 Wash. 346, 75 P. (2d) 575."

See, also, *Gover v. Central Vermont R. Co., supra,* and cases therein cited; 38 Am. Jur. 845, Negligence, § 171; 45 C. J. 1044, Negligence, § 600; 1 Shearman and Redfield (Rev. ed.) 328, Negligence, § 135.

While the defenses of assumption of risk, *volenti non fit injuria,* and contributory negligence are so closely allied that it is sometimes difficult to draw the line between them, they are not synonymous but are founded on separate, distinct principles of law. Contributory negligence involves some fault or breach of duty on the part of the injured person, or failure on his part to use the required degree of care for his safety, whereas assumption of risk or *volenti non fit injuria* may bar recovery even though the injured person may be free from contributory negligence.

The intimate connection of these defenses with each other and, at the same time, the distinctions between them are pointed out and explained in 38 Am. Jur. 847, Negligence, § 172, in the following language:

"The defense of assumption of risk is closely associated with the defense of contributory negligence. One who does not exercise ordinary care for his own safety is said, speaking broadly, to assume the risk, that is, take the chance, of being hurt. The defense of assumption of risk is not incompatible with contributory negligence; the two defenses may arise under the same state of facts. Some courts regard the defenses as interchangeable. However, there is a clear distinction between the defense of assumption of risk and the defense of contributory negligence, notwithstanding they may arise under the same set of facts and may sometimes overlap. There is a line of demarcation which, if carefully scrutinized, and followed, will allow the court to dif-

ferentiate between them. Assumption of risk rests in contract or in the principle expressed by the ancient maxim, 'volenti non fit injuria,' whereas contributory negligence rests in tort. The former involves a choice made more or less deliberately and negatives liability without reference to the fact that the plaintiff may have acted with due care, whereas the defense of contributory negligence implies the failure of the plaintiff to exercise due care. As stated in some decisions, assumption of risk is a mental state of willingness, whereas contributory negligence is a matter of conduct. It is generally agreed that assumption of risk may be a defense in a case brought by a servant against his master where there was no contributory negligence, and where more than ordinary care may have been exercised by the employee. . . . Again, the defense of assumption of risk may be good in a case where, by reason of the character of the defendant's act, contributory negligence is not a good defense."

To the same effect, see 39 C. J. 684 *et seq.*, Master and Servant, § 883. See, also, 4 Thompson, Commentaries on the Law of Negligence, 629, § 4611; Harper, Torts, 289, § 130.

The case of *Caron v. Grays Harbor County, supra,* from which we have already quoted as showing the distinction between the doctrine of assumption of risk and the principle involved in the maxim *volenti non fit injuria,* also notes the approximation, as well as the distinction, between the defense of assumption of risk and that of contributory negligence, as follows:

"While the terms 'assumed risk' and 'contributory negligence' are often used in conjunction with each other to denote the reason for precluding recovery for personal injuries, the doctrine of 'assumption of risk,' as understood in this state, is said to apply more nearly to those cases where the relation of master and servant or some similar relation exists, rather than to the relation of proprietor and invitee. *Nelson v. Booth Fisheries Co.,* 165 Wash. 521, 6 P. (2d) 388. In the latter relation of proprietor and invitee, denial of recovery is, in like circumstances, usually rested upon the principle of 'contributory negligence,' although this court has at times spoken of it as the assumption of an attendant risk. See *Polk v. Spokane Interstate Fair,* 73 Wash. 610, 132 Pac. 401; *Kavafian v. Seattle Baseball Club*

*Ass'n,* 105 Wash. 215, 177 Pac. 776, on rehearing, 105 Wash. 219, 181 Pac. 679; *Hogan v. Metropolitan Bldg. Co.,* 120 Wash. 82, 206 Pac. 959; *Juntila v. Everett School Dist. No. 24,* 183 Wash 357, 48 P. (2d) 613. In the *Polk* case, *supra,* appears the statement:

" 'The owner of the premises is liable in damages to those coming to them at his invitation, who, while in the exercise of due care, are injured because of some unsafe or negligent condition; but it is equally true that, when one voluntarily and willingly puts himself or his property in danger, there is a presumption that he assumes all the risks reasonably to be apprehended from such conduct. In cases of this kind, this assumption is called contributory negligence, and is as much a defense in these cases as to any other to which it may be applied.' "

The application of the maxim *volenti non fit injuria* and the reasons therefor were set forth in *White v. McVicker,* 216 Iowa 90, 246 N. W. 385, wherein the court quoted Broom's Legal Maxims (9th ed.), p. 188, in part, as follows:

" 'As a rule, the application of the maxim is justifiable if the plaintiff received his injuries under circumstances leading necessarily to the inference that he encountered the risk of them freely and voluntarily and with full knowledge of the nature and extent of the risk: in other words, if the real cause of the plaintiff running the risk and receiving the injuries was his own rash act.' "

The opinion in that case then continues with the following statement:

"The sum total of the application of this doctrine simply stated is that, where one is placed in the position where he has his choice of doing or not doing a given act, this doctrine applies."

An enlightening explanation of the maxim and its application is found in *Fitzgerald v. Connecticut River Paper Co.,* 155 Mass. 155, 29 N. E. 464. We take the liberty of quoting at some length from the opinion:

"It may be said that the voluntary conduct of the plaintiff in exposing himself to a known and appreciated risk is the interposition of an act which, as between the parties, makes the defendant's act, in its aspect as negligent, no longer the proximate cause of the injury; or at least is such participation in the defendant's conduct as to preclude the plaintiff

from recovering on the ground of the defendant's negligence. Certainly it would be inconsistent to hold that a defendant's act is negligent in reference to the danger of injuring the plaintiff, and that the plaintiff is not negligent in voluntarily exposing himself when he understands the danger. It is to be remembered that, in determining whether a defendant is negligent in a given case, his duty to the plaintiff at the time is to be considered, and not his general duty, or his duty to others. Therefore, when it appears that a plaintiff has knowingly and voluntarily assumed the risk of an accident, the jury should be instructed that he cannot recover, and should not be permitted to consider the conduct of the defendant by itself, and find that it was negligent, and then consider the plaintiff's conduct by itself, and find that it was reasonably careful.

"But this principle applies only when the plaintiff has voluntarily assumed the risk. As is said by Bowen, L. J., in *Thomas v. Quartermaine, ubi supra,* the maxim is not *Scienti non fit injuria,* but *Volenti non fit injuria.* The chief practical difficulty in applying it is in determining when the risk is assumed voluntarily. In the first place, one does not voluntarily assume a risk who merely knows that there is some danger, without appreciating the danger. On the other hand, he does not necessarily fail to appreciate the risk because he hopes and expects to encounter it without injury. If he comprehends the nature and the degree of the danger, and voluntarily takes his chance, he must abide the consequences, whether he is fortunate or unfortunate in the result of his venture. Sometimes the circumstances may show, as matter of law, that the risk is understood and appreciated: and often they may present in that particular a question of fact for the jury."

A similar statement is made in *Gover v. Central Vermont R. Co., supra.* Accord: *Jordan v. Seattle,* 26 Wash. 61, 66 Pac. 114; *Polk v. Spokane Interstate Fair,* 73 Wash. 610, 132 Pac. 401; *Cummins v. Dufault, supra*; 38 Am. Jur. 848, Negligence, § 173; 45 C. J. 946, Negligence, § 506.

 In the instant case, the deceased had full knowledge and appreciation of the dangers involved in entering the mine and, particularly, in working under the mat. He was an expert in mining operations, and undoubtedly more fully understood the dangerous situation at the mine than did any of appellant's officers or employees. He was aware of the

inadequate preparations made by the appellant; the lack of support for and the possible weakness of the mat; the dangerous condition of the excavated hole, because of its overhanging top, its vertical sides, and the sloughage from its walls; and the imminence of a second cave-in or slide and the consequences that would in all likelihood follow. He was under no duty or contract, at the time in question, to enter the mine and work under the mat. Despite his full knowledge and appreciation of the extreme danger involved, he voluntarily entered the mine, participated in the work being done, and, at the time of the catastrophe, was himself assuming to direct the operations. In so doing, he fully and completely brought himself within the maxim *volenti non fit injuria* as distinguished from the doctrine of assumption of risk or that of contributory negligence. In view of the distinctions between the three defenses, as elucidated above, we are of the opinion that the principle involved in the foregoing maxim constitutes the one, and the only one, of the three defenses properly applicable to the facts of this case.

The situation in this case is comparable to that in *Brucker v. Matsen,* 18 Wn. (2d) 375, 139 P. (2d) 276. In that case, the plaintiff, whose automobile had become disabled on a highway, was assisting the operator of a service truck in attaching a cable to the disabled car with the view of transporting it to a neighboring town. While engaged in that effort, the plaintiff sustained serious personal injuries as the result of a collision between an approaching automobile and the service truck. The plaintiff brought suit for damages against the owners of the service truck and their employee, alleging specific acts of negligence on the part of the defendants. The trial court granted the defendants' motion for nonsuit and dismissed the action. This court affirmed the judgment of dismissal and in its opinion said:

"If respondents [defendants] were guilty of each and every item of negligence alleged, it must be conceded that appellant [plaintiff] had full knowledge thereof when he was assisting La Grange [the operator of the service truck]. If respondents were negligent in placing appellant's automobile and their service car upon the left-hand side of the

highway; if it were negligence for the lights of the service car to be brightly burning and creating the blinding results alleged by appellant; if the perilous situation then existing was made more hazardous by reason of failure of La Grange to place warning lights along the highway; and if, as a result of all of these acts of negligence, a condition was created which respondents knew, or in the exercise of reasonable care should have known, was dangerous and likely to result in the injury of appellant, appellant also was fully aware, or in the exercise of reasonable care, should have known of the dangerous condition, and he may not close his eyes to perils thus created and recover for injuries sustained by reason of exposure of himself to such hazards. 38 Am. Jur. 860, 865. As appellant's knowledge of the danger equaled that of the respondents, no liability is predicable of the injury proximately resulting therefrom."

Respondent contends that the maxim of *volenti non fit injuria* is not applicable in this case, because the conditions of the mine constituted a rescue situation, in which the deceased was engaged in rescue work.

■ The applicability of the rescue doctrine was considered and discussed in the recent case of *Hawkins v. Palmer*, 29 Wn. (2d) 570, 188 P. (2d) 121. As declared in the opinion in that case, the rescue doctrine, briefly stated, is that one who sees a person in imminent and serious peril due to the negligence of another cannot be charged with contributory negligence, as a matter of law, in risking his own life or serious injury to himself in attempting to effect a rescue, provided the attempt is not rashly or recklessly made.

Further explaining this doctrine, the court, in the *Hawkins* case, said:

"The rescue doctrine is applicable when one acts impulsively, oblivious of peril, to save or assist an injured person or a person whose injury is imminent; or when, conscious of the peril and weighing the consequences, he nonetheless goes to the aid of the injured person or the person whose injury is imminent. As Justice Cardozo said in *Wagner v. International R. Co.*, 232 N. Y. 176, 133 N. E. 437, 19 A. L. R. 1:

" 'The law does not discriminate between the rescuer oblivious of peril and the one who counts the cost. It is

enough that the act, whether impulsive or deliberate, is the child of the occasion.'

"The basis of the doctrine is that the normal prudential faculties are not operative, being set aside either by impulsive action or because danger is deliberately encountered for a greater good, such as the saving of a life."

■ Although we approve the rescue doctrine, as defined and explained in the *Hawkins* case, *supra,* it has no application here. The instant case in no sense presented a rescue situation. Mr. Walsh was not oblivious to peril, nor did he act impulsively. His acts were not to save or assist an injured person or a person who was in imminent and serious peril.

Respondent contends that the question of rescue was nevertheless in the case, for the reason that the trial court instructed the jury upon that theory, without exception being taken thereto by appellant. Her contention is based upon the argument that an instruction given and not excepted to becomes the law of the case on appeal, as held in *State v. McDaniels,* 30 Wn. (2d) 76, 190 P. (2d) 705, and cases therein cited.

While we are in accord with that rule, it has no application in this case. The question with which we are here concerned is whether the trial court erred in refusing to grant appellant's motion for a directed verdict, at the conclusion of the evidence.

■ If the evidence in a case is not sufficient to warrant the case going to the jury, then the trial court must, as a matter of law, grant a motion for a directed verdict in favor of the defendant. A ruling upon such motion is based upon the facts as established by the evidence and upon the law applicable to such facts. If the facts establish a valid defense, then the defendant is entitled, as a matter of law, to have the jury instructed to return a verdict in his favor.

■ The mere fact that the trial court, having erred in refusing to grant appellant's motion for a directed verdict, thereafter, without exception being taken, instructed the jury on the rescue doctrine, does not, as a matter of law, require this court, when reviewing the trial court's ruling

on the motion for directed verdict, to consider respondent's contention of rescue work as being an established fact.

This question of the effect of submitting a case to the jury upon instructions by the court after a motion for directed verdict is denied has quite recently been passed upon by this court and has been decided adversely to respondent's contention, *Tonkovich v. Department of Labor & Industries*, *ante* p. 220, 195 P. (2d) 638, wherein other cases from this jurisdiction are assembled. To the same effect, see *Wolf v. Chicago Sign Printing Co.*, 233 Ill. 501, 84 N. E. 614, 13 Ann. Cas. 369; *Engberg v. Great Northern R. Co.*, 207 Minn. 194, 290 N. W. 579, 154 A. L. R. 206; 53 Am. Jur. 324, Trial, § 404; 64 C. J. 1301, Trial, § 1185.

In the *Tonkovich* case, *supra*, the law with reference to such situation is clearly stated as follows:

"It is the approved rule in this state that the parties are bound by the law laid down by the court in its instructions where, as here, the charge is approved by counsel for each party, no objections or exceptions thereto having been made at any stage. In such case, the sufficiency of the evidence to sustain the verdict is to be determined by the application of the instructions and rules of law laid down in the charge. *This rule does not apply if the record or evidence conclusively shows that the party in whose favor the verdict is rendered is not entitled to recover. No man should be allowed to recover in any case unless there is evidence to support his contention.*" (Italics ours.)

At the close of all the evidence in the instant case, the facts presented a situation where the maxim *volenti non fit injuria* was unquestionably applicable, and the trial court erred in not granting appellant's motion for a directed verdict. In our opinion, the facts presented a case where reasonable minds could not differ.

Since our decision on this point effectually disposes of the case, it is unnecessary to consider appellant's remaining assignments of error.

The judgment is reversed, with direction to the trial court to enter a judgment dismissing the action.

MALLERY, C. J., BEALS, ROBINSON, and JEFFERS, JJ., concur.