[No. 37298.   En Banc.   September 9, 1965.]

JOSEPH PERRY *et al., Appellants,* v. SEATTLE SCHOOL DISTRICT No. 1 *et al., Respondents.*\*

*Reported in 405 P.2d 589.

*Merges, Brain & Hilyer* (*Edwards E. Merges,* of counsel) and *Max R. Nicolai,* for appellants.

*Charles O. Carroll, James E. Kennedy,* and *Stanley E. Stone,* for respondents.

HILL, J.—This is an action for damages against Seattle School District #1 for injuries sustained by a spectator while watching a football game from the side lines.

The trial court, after hearing all of the evidence, entered a judgment of dismissal. The plaintiffs[1] appeal. The facts, as found by the trial court, were as follows:

> That the plaintiff was seriously, painfully and permanently injured while a spectator at a football game, being conducted under the supervision of the defendant school district at the Garfield playfield, a Seattle Park Department facility, and that on the occasion in question a football game was in progress between the third teams of Garfield and West Seattle High Schools. That high

---

[1]The plaintiffs were Joseph Perry and Louise S. Perry, husband and wife. Mrs. Perry sustained the injuries, and in the quoted findings of the trial court she is referred to as though she was the only plaintiff. Though her husband was with her at the time of the injury, he did not testify.

schools are permitted to use the facility by permission of the Park Department. Finding No. 1.

That the plaintiff was a grandmother, 67 years of age, at the time of the accident . . . That the plaintiff had been invited to attend the game by her grandson, Tom Winkle, a member of the West Seattle team, . . . to see him play . . . Tom Winkle had been encouraged to invite his parents, relatives and friends to this and other games by programs at the West Seattle High School assemblies. Mr. Driscoll, a teacher coach at the West Seattle High School, stated that the support of parents and relatives by attendance at such games was a valuable morale builder and that the students were told that he would appreciate attendance of parents and relatives at such games. Numerous other parents, friends and relatives were attending the game in question. No admission was charged . . . . Finding No. 2.

The plaintiff had never been to a third team high school football game before and had attended only one other football game in her life. She was not familiar with the game of football; the only other game that she had attended had been several years previously at the high school memorial stadium where she sat in the grandstand. Finding No. 3.

The football field was of standard size and the boundaries of the field were marked out in chalk. There were two sixty person sets of bleacher seats on the west side of the field which was informally considered the Garfield side and was occupied solely by Garfield players who pile their equipment on at least one-third of the bleacher seats. The plaintiff was not requested to sit in them. There were no bleachers provided on what was considered the West Seattle side and the plaintiff went to stand on that side along with all the other spectators from West Seattle and with the knowledge and consent of the defendant school district employees supervising the game. No one from the school gave oral direction as to where plaintiff was to stand. The spectators were lined up along the sideline to watch the contest and the only supervision was requests by the defendant's officials that they stay on the outside of the line marking the boundary of the playing field. Frequently, persons in the crowd who moved across the line and onto the playing field were requested to move back of the line. There is no evidence that the plaintiff was at any time over the line and onto the playing field. Finding No. 4.

As in all football games, players frequently run or are knocked out of bounds and if a play came near the crowd it would fan away from the players. The defendant was at all times aware of such condition. There was testimony that in other similar games spectators had been run into or knocked down. Finding No. 5.

The plaintiff on the date of the accident in question arrived at the field before game time. She was accompanied by her daughter, . . . Tom's mother. They joined the group of spectators on the west side of the field which was considered the West Seattle side. Standing with them was Mrs. Dolores McLeod, mother of another West Seattle player. They took a position at around the 50-yard line and stood one or two feet outside the east line of the field. The plaintiff was standing in the front row and the crowd was about four persons deep. At the time the accident occurred, the plaintiff and her daughter were about a foot or two back of the line indicating the boundary of the playing field and were standing at a place where they were supposed to be as far as the defendant and its supervisors were concerned; that being off the field and back of the line. The plaintiff and Mrs. McLeod were conversing and none of them seemed to have been paying close attention to the progress of the game. Just before the accident the offensive team was starting a play from about the 30-yard line when the ball carrier . . . made a wide end run around the east side of the playing field, running close to the sidelines. As he arrived opposite where the plaintiff was standing, he was hit by two Garfield players, knocked out of bounds, and into the plaintiff, who was thrown violently to the ground and was severely and permanently injured. She was standing with all the other persons in the crowd which was watching the game; she did not watch the player carry the ball on the play in question and did not see him until just before she was struck when the player was tackled. The game had been in progress for a time estimated variously from ten minutes to about a minute before the end of the second ten-minute quarter. No players had been run off the field before the accident. Finding No. 6.

The court finds that there was danger and hazard to spectators standing where the plaintiff stood when the play came her way unless such persons stepped away. Finding No. 7.

Expert testimony by Mr. Driscoll, one of the coaches, was to the effect that five yards back from the line marking the playing field would have been a safer place for spectators to stand and some of the players testified as experts that roping off an area some yards back would have made a safer place to stand and the court so finds. The defendant offered no contention nor evidence that it was unable to provide such safety measures, nor was there any evidence that such measures were customarily taken in games of this sort. That there was no rule nor regulation to prevent the defendant from requiring spectators to stand further back from the line nor from requiring spectators to use the bleacher seats on the east side of the field which were then being used by the Garfield football players. Finding No. 8.

The court finds that the plaintiff was invited by the defendant to attend the game in question and complied with the rules and requests of the defendant that she stand back of the line marking the playing field at all times. No other instructions were given to plaintiff. The court further finds that the play in question started on the thirty-yard line near the west sideline and took approximately fifteen seconds between its origin and the injury to the plaintiff. Finding No. 9.

That the game in question was solely and wholly under the control and supervision of the defendant and its agents and that such agents consisted of linesmen, coaches and referees, all of whom were familiar with the fact that players do sometimes run off the field and into crowds and spectators. Finding No. 10.

From these findings of fact the court concluded: (a) that the defendant was not negligent; (b) that the plaintiff was contributorily negligent; and (c) that the plaintiff voluntarily assumed the risk of being injured by standing in close proximity to the sidelines.

■ These, in themselves, are the ultimate issues upon which a jury might be required, under proper instructions, to make a finding. (If the defendant was found to be not negligent, no other finding would be necessary.) Negligence, contributory negligence, and assumption of risk were all issues to be determined by the trier of the facts. *Morris v. Cleveland Hockey Club*, 157 Ohio St. 225, 105 N.E.2d

419 (1952); *Shanney v. Boston Madison Square Garden Corp.*, 296 Mass. 168, 5 N.E.2d 1 (1936).

■ The applicable rule as to the duty of the school district is that it must observe, if it is to provide for the safety of its invitees, that degree of care, precaution and vigilance which the circumstances demand. *Kavafian v. Seattle Baseball Club Ass'n*, 105 Wash. 215, 177 Pac. 776, 181 Pac. 679 (1919). The "circumstances" would seem to require, where large crowds attend because of interest in the outcome of the game, a higher degree of care than in more informal second and third-team and intramural contests where no admission is charged and those who attend are largely relatives or personal friends of the participants. Here there is no profit and the purpose is to make possible a wider participation in the sport.

■ On each issue considered by the trial court, it seems to us that reasonable minds might, on the basis of the evidence as set out by the court in the quoted findings, have disagreed. As to (a), the negligence of the defendant school district, reasonable minds might conclude that the school district was negligent in not having placed ropes 5 yards back from the side lines and in failing to keep spectators that distance from the playing field, or in failing to have had bleachers for spectators on both sides of the playing field (on the same theory that professional baseball parks are required to have certain areas in the grandstands, protected by netting, available to those who desire such protection). *Kavafian v. Seattle Baseball Club Ass'n, supra.*

Other equally reasonable minds might conclude that the chances were minimal that the friends and relatives of the participants, together with the students and fans attending a third-team football game, would not be fully aware of the hazards involved in side-line spectatorship and that the chances of a spectator being seriously injured were remote. They would then reach the ultimate conclusion that the school district was under no duty to go to the expense of roping off the field and providing the neces-

sary policing to try to keep spectators back of the ropes, or to provide bleachers for those, if any, who desired them.

Whether or not the plaintiff was as completely ignorant of the game of football as her testimony indicates, is not controlling on the issue of negligence. The question of the ordinary care required of the defendant must, to some extent, be predicated upon the knowledge of the ordinary person of the risk involved. As Prosser suggests,[2] the owner of a hockey rink is not required to ask each entering patron whether he has ever witnessed a hockey game before, but can reasonably assume that the danger of being hit by the puck is understood and accepted.

There was substantial evidence to sustain the trial court's finding that the School District was not negligent.

We now turn our attention to the evidence supporting the trial court's finding that the plaintiff wife was contributorily negligent. She, together with her plaintiff husband (who does watch football on television, but "not much,"[3] and is one of the plaintiffs in this action seeking recovery for his wife's injuries) took their places on the sidelines for this particular contest to watch the game. Obviously, it was a game of physical contacts and played within a relatively large area whose boundaries came within a foot or two of where she was standing.

It is urged that she was invited there to watch the game by her grandson at the behest of the school authorities. Had she been watching it for the 15 seconds prior to the time she was hit, she would have seen an end run developing and coming in her direction, and she could doubtless have gotten out of the way as everyone else did. However, she was not watching the game, but was

---

[2] Prosser, Torts § 55, p. 311 (2d ed. 1955). See also 2 Harper & James, Law of Torts § 16.5, p. 913 (1956).

[3] On her deposition, the plaintiff wife, in response to the question, "How often would you say during football season your husband does in fact watch football games?" answered, "Quite a few. I couldn't say." At the trial she testified, in response to a similar question: "Partially. Not much. He might turn it on there and leave it on for a few minutes and turn it to something else."

engaging in a conversation with a friend;[4] and she did not see the approaching ball carrier until he was too close for her to avoid him. Even, conceding the ignorance of the game of football claimed by the plaintiff wife, some objective standard of negligence must be applied. She cannot be heard to say that she did not comprehend a risk which would be apparent to a reasonably prudent and cautious person. As Prosser[5] puts it:

> So far as perception is concerned, it seems clear that the actor must give to his surroundings the attention which a standard reasonable man would consider necessary under the circumstances, and that he must use such senses as he has to discover what is readily apparent. He may be negligent in failing to look, or in failing to observe what is visible when he does look.

The plaintiff wife had a duty to protect herself not only against dangers of which she had actual knowledge, but such dangers incident to the game as would be apparent to a reasonable person in the exercise of due care.

The only two cases cited[6] by counsel, involving injuries to side-line spectators at football games, deny recovery: One holding, as a matter of law, that the school on whose premises the game was being played was not negligent, and setting aside a judgment for the plaintiff (*Ingerson v. Shattuck School*, 185 Minn. 16, 18, 239 N.W. 667 (1931)); the other holding, as a matter of law, that an injured spectator was contributorily negligent and assumed the risk of injury, and therefore dismissed the action before trial (*Col-*

---

[4]A pet aversion of many people in stadia throughout the country is ladies who engage in chitchat oblivious of the punts, passes, plunges, and pursuit on the gridiron before them. We have heard it called many things, but never contributory negligence. It is easy to see, however, that such conversation while standing on the side lines, might well be contributory negligence.

[5]Prosser, Torts § 32, p. 160 (3d ed. 1964).

[6]The very paucity of decisions would indicate that side-line spectators are a nonlitigious clan, or that, as Cardozo expressed it: "The timorous may stay at home." *Murphy v. Steeplechase Amusement Co.*, 250 N.Y. 479, 166 N.E. 173 (1929).

*clough v. Orleans Parish School Board*, 166 So. 2d 647 (La. Ct. App. 1964)).

We do not go as far as either of these cases. We hold merely that the trier of the facts could certainly find, as the trial court did here, that the defendant School District was not negligent and that the plaintiff wife was contributorily negligent.

The trial court also based its judgment of dismissal on a holding that the plaintiff wife had assumed the risk. Ordinarily, the defense of assumption of risk serves no useful purpose since it introduces nothing that is not fully covered either by the idea of an absence of duty on the part of the defendant, or by that of contributory negligence of the plaintiff, both of which we have heretofore considered. The term does, however, focus attention upon the element of voluntary acceptance of a known risk which is sometimes, but not always, involved in both of the other ideas.

It is argued that there could be no assumption of risk, as the plaintiff wife had no knowledge of the game of football and could not assume a risk of which she had no knowledge.

While it is clear that a plaintiff must know the risk before it can be assumed, it is equally clear that he cannot deny knowledge of the obvious. Prosser[7] points out:

> By entering freely and voluntarily into any relation or situation which presents obvious danger, the plaintiff may be taken to accept it, and to undertake to look out for himself and relieve the defendant of responsibility. Thus those who participate or sit as spectators at sports and amusements may be taken to assume all the known risks of being hurt by roller coasters, flying baseballs, golf balls, or wrestlers, or such things as fireworks explosions.

The Supreme Court of Minnesota in *Modec v. City of Eveleth*, 224 Minn. 556, 560, 29 N.W.2d 453, 455 (1947),[8] said that

---

[7]Prosser, Torts § 67, pp. 459-60 (3d ed. 1964). See also 2 Harper & James, Law of Torts § 21.2, pp. 1169-70 (1956).

[8]The plaintiff, in that case, had recovered damages for having been hit with a hockey puck. A verdict for the plaintiff was set aside by the

Any person of ordinary intelligence cannot watch a game of hockey for any length of time without realizing the risks involved to players and spectators alike.

This is a paraphrase of a similar statement applied to one claiming ignorance of the risk from foul balls at a baseball game. *Brisson v. Minneapolis Baseball & Athletic Ass'n,* 185 Minn. 507, 240 N.W. 903 (1932). It seems equally applicable to football.

There is here a factual issue on assumption of risk both as to the actual knowledge of the plaintiff wife, and as to whether, if there was not actual knowledge, the danger was so obvious that knowledge could be implied.

The plaintiff knew that there was such a game as football. She had previously seen a game, albeit in the protection of the stands at the Seattle High School Memorial Stadium. The trier of the facts might well have inferred that anybody who had ever seen an entire football game must know that some plays do go out of bounds.

The trier of the facts might also have inferred that in the game at which the plaintiff wife was injured, it was obvious to any person of ordinary intelligence that plays might go out of bounds.

The trier of the facts, in this case, concluded that there was an assumption of risk, and it is our view that he was entitled so to do.

We, therefore, affirm on all three grounds relied upon by the trial court, *i.e.,* no negligence on the part of the defendant; contributory negligence on the part of the plaintiff wife; and assumption of risk by the plaintiff wife.

It is to be noted that any one of these grounds is decisive of the case, and that a contrary result would require a holding that, as a matter of law, there was negligence on the part of the defendant; that, as a matter of law, the

trial judge and the action dismissed on the basis that the plaintiff had, as a matter of law, assumed the risk. The quoted statement actually goes beyond the facts in the case, as the plaintiff had seen several hockey games.

plaintiff wife was not contributorily negligent; and that, as a matter of law, she did not assume the risk.

Judgment of dismissal affirmed.

DONWORTH, WEAVER, and OTT, JJ., and BARNETT, J. Pro Tem., concur.

HUNTER, J. (concurring in part and dissenting in part)— I concur in the result of the majority opinion on the grounds of (1) contributory negligence and (2) the assumption of risk by the plaintiff's wife.

I believe the school district as a matter of law was negligent for the reasons stated in Judge Hale's dissenting opinion.

HALE, J. (dissenting)—I dissent from the majority opinion because, when analyzed in minute detail, it seems to exonerate the school district of every conceivable duty toward spectators except the obligation to refrain from inflicting willful injuries. The majority's ruling will make no distinction between the idly curious, informed football fan and the specially invited but uninitiated guest. The findings of fact, I am confident, bear me out on this proposition. I would, therefore, hold that the findings of fact do not support the conclusions of law, and, given the facts here, liability for plaintiff's injuries should follow as a matter of law.

Here are the facts—all expressly found by the trial court—from which, in my view, the district's liability seems established:

1. The game of football was "being conducted under the supervision of the defendant school district."

2. ". . . [P]laintiff had been invited to attend the game by her grandson, Tom Winkle, a member of the West Seattle team . . . to see him play in the game."

3. "Tom . . . had been encouraged to invite his parents, relatives and friends to this and other games by programs at the West Seattle High School assemblies. . . . [T]he students were told [by the teacher-coach]

that he would appreciate attendance of parents and relatives at such games."

4. "Plaintiff . . . had attended only one other football game in her life. She was not familiar with the game of football; the only other game that she had attended had been several years previously at the high school memorial stadium where she sat in the grandstand."

5. "The plaintiff was not requested to sit" in the bleachers across the field, which bleachers were "occupied solely by Garfield players who pile[d] their equipment on at least one-third of the bleacher seats. . . . There were no bleachers provided on what was considered the West Seattle side. . . ."

6. Plaintiff went to stand on the West Seattle side "along with all the other spectators from West Seattle and with the knowledge and consent of the defendant school district employees supervising the game."

7. "At the time the accident occurred, the plaintiff and her daughter were about a foot or two" outside the sidelines *"and were standing at a place where they were supposed to be as far as the defendant and its supervisors were concerned; . . ."* (Italics mine.)

8. "The court finds that there was danger and hazard to spectators standing where the plaintiff stood when the play came her way unless such persons stepped away."

9. Experts said, and the court agreed, that a distance of 5 yards outside the boundaries would have been a comparatively safe place for spectators to stand.

10. No players had run out of bounds in this game before the accident. Defendant could have required spectators to use the bleachers across the field or could have required the spectators to stand a safe distance from the playing field.

Given the foregoing facts, I must part company with the majority when it accepts the conclusions of law derived therefrom. Although I do agree with the trial court's conclusion that the plaintiff was an invitee at the football game, I believe the facts fail to support the remaining conclusions of law:

"That plaintiff's ignorance of the game of football is not a basis for holding defendant, Seattle School District No. 1, liable;" that the school district breached no duty owed to the plaintiff; "that it was not reasonably foreseeable to defendant that a risk of injury existed to a spectator in these circumstances."

And I find no basis in fact for the other conclusions of law, exonerating the school district, as follows:

VI. That no negligence on the part of the defendant, Seattle School District No. 1, caused or contributed to the injuries in question.

VII. That negligence on the part of the plaintiff caused or contributed to the accident or the injuries in question.

VIII. That the plaintiff was of sufficient age, intelligence and experience to appreciate, and should have appreciated, the dangers involved in the game of football and that the plaintiff voluntarily assumed the risk of being injured by standing in close proximity to the sidelines.

The inconsistencies between the findings and conclusions seem quite clear, and would appear to call for conclusions of law quite the opposite of those drawn by the trial court.

Having found as a fact that players "frequently run or are knocked out of bounds," and that the defendant was aware of this, how can it be concluded that it "was not reasonably foreseeable to defendant that a risk of injury existed to a spectator in these circumstances?" Without intending to labor the obvious, it would seem that this is the one type of injury that is clearly foreseeable—the one thing that, in the natural course of events, will likely occur.

The next inconsistency, between fact and conclusion, lies in the legal conclusion that plaintiff's ignorance of the game of football is not a basis for liability. Having already found that plaintiff knew virtually nothing about football and that she had been especially invited by defendant to watch the game, how can the court logically conclude that she assumed the risk of or contributed to her injury in doing the very thing expected of her by defendant—stand along the sidelines among the spectators?

The conclusions that plaintiff was both contributorially negligent and voluntarily assumed the risk by standing close to the sidelines relate to no facts showing appreciation of the hazards inhering in the situation, nor to acts or omissions showing want of ordinary care on the part of an uninformed, invited spectator. She stood where the district invited her to stand because it ignored its duty to instruct her otherwise.

I agree with the majority that *Ingerson v. Shattuck School,* 185 Minn. 16, 239 N.W. 667, is similar, but the reasoning of the dissenting opinion in that case seems more cogent and persuasive to me than that of the majority. I have little doubt that were the same case to come before that court today, the dissenting opinion would represent the prevailing view. I find in that case, however, several elements which distinguish it from the instant situation. There, although the court could well have imputed sufficient appreciation of the hazards to invoke the assumption of risk doctrine against her, it declined to do so, saying:

> Mrs. Ingerson had attended three football games prior to this one. It is shown to be a more or less common occurrence for the football and for players to cross and go outside of the lines of the playing field. *Prior to the accident, that had happened a few times in this game.* Defendant contends that Mrs. Ingerson's knowledge of the situation was such that she assumed the risk of any injury resulting. We do not so hold as a matter of law. (Italics mine.)

In the instant case, the trial court based its conclusions in part on assumption of risk with no evidence whatever of knowledge on the part of the plaintiff that she knew the players might crash into her at a place outside the playing field.

In *Ingerson, supra,* the court sustained a judgment for the defendant school solely because it found no negligence on the part of the district, and pointed out why the school could not be held negligent. It showed that the school had

provided the plaintiff with a clear choice of places in which to sit.

Negligence is charged on the ground that defendant failed to provide safe and proper seats for spectators. It is sufficient to say that it is not shown that Mrs. Ingerson sought to obtain one of the seats provided or requested to be provided with a seat, or that she would not have had a seat in the bleachers if she had gone there for that purpose. Her son was the captain of the Mankato team and was seated on a bench away from the bleachers, and she went there to be with or near him.

In the present case, plaintiff was aware of no such choice and the district took no steps to make clear to her that such a choice was available. Plaintiff was not, as in *Ingerson, supra,* standing near the sidelines "to be with or near" her grandson, but stood there merely to watch the game along with the other spectators. *Ingerson, supra,* does not exonerate the school as a matter of law from all duties but, quite the contrary, implies a duty to warn uninitiated spectators when it says:

The defendant owed to plaintiffs the duty of exercising ordinary or reasonable care under the circumstances shown, the degree of care depending upon the situation shown.

Accordingly, in the instant case, where negligence is not charged on the ultimate failure to provide a safe place for spectators, but rather on the failure of the district to give notice to the plaintiff that she ought to stand a reasonably safe distance from the sidelines, she comes within the foregoing protective doctrine. I would conclude, therefore, that even under *Ingerson v. Shattuck School, supra,* plaintiff was entitled to some warning, notice, or signal from the school district to remain away from the immediate sidelines or to sit in the bleachers if the district is to be held to its duty of ordinary care for her. Had the evidence shown that the district had taken some steps in the discharge of its duty to exercise ordinary care, then the conclusions of law exonerating the defendant would be sound, but no such actions seem to have been taken.

*Kavafian v. Seattle Baseball Club Ass'n,* 105 Wash. 215, 177 Pac. 776, 181 Pac. 679 (1919), cited by the majority, not only puts the duty of reasonable and ordinary care on the defendant, but goes farther, I would say, in laying down a rule particularly appropriate to plaintiff's case. After showing that the plaintiff understood the game of baseball and was "conscious of the fact that balls are very often hit 'foul,'" and that "wild throws sometimes result in the ball falling among the spectators," the decision turns on the pivotal fact that the plaintiff selected an unscreened and unprotected seat when seats behind a screened and protected area were readily available to him.

Deciding the case on the proposition that the defendant baseball club had exercised ordinary care as a matter of law in providing a readily accessible seat behind a screen, this court said of the plaintiff:

> The place in which he could have taken a seat would have fully protected him against the ordinary and usual hazards . . . Having purchased a ticket which offered him a choice of two positions, he, *with full knowledge of the risk of injury,* chose the more dangerous position. (Italics mine.)

Where the defense of contributory negligence involves appreciation of the danger whence came the injury, or assumption of risk and volenti non fit injuria, together, separately, or in conjunction with that of contributory negligence, are urged as defenses, this court has held such defenses untenable unless there is substantial evidence to show that the plaintiff knew of and appreciated the dangers from which the injury came, or should, in the exercise of ordinary care, as a matter of law be charged with such knowledge and appreciation. *Anderson v. Rohde,* 46 Wn.2d 89, 278 P.2d 380; *Kingwell v. Hart,* 45 Wn.2d 401, 275 P.2d 431; *Ewer v. Johnson,* 44 Wn.2d 746, 270 P.2d 813; *Walsh v. West Coast Coal Mines, Inc.,* 31 Wn.2d 396, 197 P.2d 233.

The trial court found as a fact that plaintiff "was not familiar with the game of football" and had "attended only one other football game in her life," and that one

several years previously at a stadium where she sat in the grandstand. Having no knowledge of football, and testifying categorically that she was unaware of any danger from the players, plaintiff said the idea of being run into by players as she stood with the other spectators never even occurred to her. Nor was any evidence presented to the contrary showing that she had knowledge or appreciation of such danger. Moreover, if she had no such knowledge before arriving at the game, she could not be said to have acquired it at the game, for the trial court, in finding that players in the game of football may run violently out of bounds, also found in this game that "No players had been run off the field before the accident." Accordingly, it would seem the statement in Prosser, Torts § 67, pp. 459-60 (3d ed. 1964), that a spectator may be taken to assume all *known* risks from roller coasters, flying baseballs, golf balls, wrestlers, and such things as fireworks explosions, has little application to plaintiff's predicament here because she neither knew of the danger nor had anything occurred earlier to charge her, in the exercise of reasonable prudence, with such knowledge.

Therefore, since plaintiff had no knowledge of the likelihood that the players might come charging into her if she stood within a few feet of the sidelines, she cannot be held either contributorially negligent, or to have assumed the risk of injury or consented to it by standing there (volenti non fit injuria) unless she, in the exercise of ordinary care for her own safety, may be charged with such knowledge as a matter of law. I would be loathe to declare it the rule of law in this country that a 67-year-old woman, having seen only one game of football in her lifetime, and that one from the distant security of a grandstand seat, and having no interest whatever in the game or the method of playing it, is held to understand that, without warning, the players may come running into her with great force at a place well outside the clearly marked playing field. Nor would I hold that same 67-year-old grandmother to possess as a matter of law the requisite peripheral vision, timing and agility to sidestep or other-

wise avoid the onrushing players. The facts, therefore, leave no basis for a conclusion of either contributory negligence, assumption of risk, or volenti non fit injuria.

On the question of defendant's negligence, we have already seen that it owed a duty of ordinary and reasonable care to the plaintiff under the circumstances. Granted this duty, the facts show that defendant district took not a single step, significant or minor, to discharge its duty. It did nothing whatever to warn this plaintiff that she should stand a safe distance from the sidelines. Its agents—the coaches and officials—said nothing; they uttered no cautionary words nor did they direct the bystanders to sit in the bleachers; no ropes, lines, signs or other devices cautioned her to stand back, although any one of these devices could have been readily provided. I do not say which one or which method would meet the requirements of due care under the circumstances, but simply that the total absence of any warning, admonition or suggestion did constitute negligence proximately leading to plaintiff's injury. Had the school district taken any precaution whatever, of whatever degree or formality, it would then have been the trier of the facts' responsibility to ascertain if it met the standards of ordinary care under the circumstances. But the total absence of such precaution, the complete failure to do anything whatever to protect the plaintiff from a hazard well known to the defendant, I think, leads to the conclusion of negligence from the facts found.

I would, for these reasons, reverse and remand to hear the issue of damages solely.

ROSELLINI, C. J. and HAMILTON, J., concur with HALE, J.

---

November 2, 1965. Petition for rehearing denied.