MARY MODEC v. CITY OF EVELETH.[1]

October 31, 1947.

No. 34,473.

---

*A. C. Johnston,* for appellant.

*M. H. Greenberg,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff recovered a verdict for $2,000 in her negligence action against defendant. Upon defendant's alternative motion for judgment or a new trial, the court, by its order here for review, granted the motion for judgment. Plaintiff has appealed.

During the time here involved, defendant was the owner of a building known as the Hippodrome, constructed at least 20 years ago and used in large part during the winter for hockey games. It has a large arena, which during the winter months is covered with ice and is used by high-school, college, semiprofessional, and independent teams for hockey games, and also by the general public for skating. During other seasons, it is used for various recreational and educational projects put on by the city. We are primarily concerned with the arena as it is used during the winter, which is also the hockey season.

The arena is surrounded by seats for the use of spectators. In front of the first row of seats there is a wooden wall which extends above the ice surface about four feet. The bottom row of seats is about two feet below the top of this wall. From there, the rows of seats rise in tiers, so that spectators occupying seats at the higher

levels are afforded an unobstructed view of the games staged on the ice.

In the playing of hockey, goals are placed at the ends of the arena. Back of the goals are wire nets. These are of a sufficient height to protect against possible injury to any spectator sitting behind the goals from a flying puck if it is raised off the ice by a player's stick. There is no such net along the sides of the rink.

At the time in question, the city had leased this building to a private concern, referred to in the record as the Eveleth Hockey Association. For that privilege or right, it paid the city $150 for the hockey season. As lessee, it was in full charge of the arena, and it charged and collected general admission fees. There were no reserved seats, and spectators who had paid the admission fee had the right to select any seat they wished or could obtain. There is no evidence in the record that plaintiff could not have taken a seat back of the wire net behind one of the goals had she so desired.

The record does not show how often a puck actually leaves the ice, clears the side wall, and lands among the spectators, or the probability of its doing so. Hockey has been played in this arena for more than 20 years, and this was the first time, so far as the record discloses, that a puck shot by one of the players had struck a spectator.

Plaintiff was about 37 years of age at the time she suffered the injury for which this action was brought. She had lived in defendant city all her life and had attended several hockey games there. She also had a brother who played hockey. She knew how the game was scored, and she was generally familiar with such hockey terms as "net," "puck," and "end zones."

In granting the motion for judgment, the trial court recited the fact that the teams of many schools, universities, and other institutions play hockey extensively, and that this is especially true in the region of Eveleth and other Range towns. The court was of the view that in the situation here presented a person attending such a game was presumed to know and appreciate the risks of being hit by a puck during the playing of the game, and that the rule of law as

applied by this and other courts in baseball games should apply here. Applying our holdings in baseball cases, the court concluded that defendant had not been proved negligent in any respect, and that plaintiff had assumed the risk of injury. In support of its view, the court cited Wells v. Minneapolis Baseball & Athletic Assn. 122 Minn. 327, 142 N. W. 706, 46 L.R.A. (N.S.) 606, Ann. Cas. 1914D, 922, and Brisson v. Minneapolis Baseball & Athletic Assn. 185 Minn. 507, 240 N. W. 903. It recognized the fact that there is a division of opinion among the courts as to whether the nonliability rule applied in baseball games should be applied to hockey. It cited cases from California, Nebraska, Massachusetts, and Rhode Island holding that spectators are not so familiar with hockey as they are with baseball, and for that reason assumption of risk becomes a fact issue for the jury to determine. These courts think that hockey is a comparatively new sport and little known to most people; hence, that the risks commonly known and appreciated by spectators in connection with baseball games do not apply to hockey games.

Hockey is played on the ice by two opposing teams of six persons each. The playing space, which is oblong in shape, is usually limited by marks on the ice or by barriers, such as the wooden walls in this case. At each end of the playing area, a short distance removed from the barrier, there are goals. These are fashioned of netting over a frame in the shape of a lean-to, with the open side away from the barrier. The players use skates and are equipped with long-handled sticks or clubs. The striking end of the hockey stick forms about a 110-degree angle with the handle, is about 16 inches long, three to four inches high, a fraction of an inch wide at the top, and slightly wider at the bottom. The puck is the bone of contention in the game.

The object of the game is to place the puck in the goal of the opposing team either by pushing it or by striking it with such force from the playing area as to cause it to fly past the opposing player guarding the goal. Bodily contact is not barred, but is an accepted way for a player to stop his opponent. Thus, the ability to give and take is essential to a successful hockey player. Speed is also an im-

portant phase of the game. Sports authorities generally consider it to be the fastest game played in this country and Canada. Thus, the ability of these expert skaters to execute at high speed the difficult plays of the game and the strength required to withstand the crushing contacts inflicted by player upon player in an effort to get possession of the zealously guarded puck show that hockey is a game where speed, skill, and physical endurance are of the utmost importance. It is a man's game. When the puck is passed from player to player across the playing area it often rises from the ice. Since the puck is round with a flat bottom and top, it is not always possible for a particular player to determine the direction the puck will take when in flight, nor how high it will rise. Any person of ordinary intelligence cannot watch a game of hockey for any length of time without realizing the risks involved to players and spectators alike.

 That there are dangers involved in hockey games as well as in baseball games is apparent. As to baseball, two cases have come to us for review. But this is our first case involving hockey.

In the Wells case we said (122 Minn. 331, 142 N. W. 708):

"* * * Baseball is not free from danger to those witnessing the game. But the perils are not so imminent that due care on the part of the management requires all the spectators to be screened in. In fact, a large part of those who attend prefer to sit where no screen obscures the view. The defendant has a right to cater to their desires. We believe that, as to all who, with full knowledge of the danger from thrown or batted balls, attend a baseball game, the management cannot be held negligent when it provides a choice between a screened-in and an open seat, the screen being reasonably sufficient as to extent and substance."

We approved what was said in the cited case in the Brisson case, where, speaking of defendant's duties to spectators, we said (185 Minn. 508, 240 N. W. 904):

"* * * We do not think that the management must, in order to free itself from the charge of negligence, provide screened seats

for all who may possibly apply therefor. In our opinion they exercise the required care if they provide screen for the most dangerous part of the grand stand and for those who may be reasonably anticipated to desire protected seats, and that they need not provide such seats for an unusual crowd, such as the one in attendance at the game here involved."

And we concluded (185 Minn. 509, 240 N. W. 904):

"* * * In our opinion no adult of reasonable intelligence, even with the limited experience of the plaintiff, could fail to realize that he would be injured if he was struck by a thrown or batted ball such as are used in league games of the character which he was observing, nor could he fail to realize that foul balls were likely to be directed toward where he was sitting. No one of ordinary intelligence could see many innings of the ordinary league game without coming to a full realization that batters cannot and do not control the direction of the ball which they strike and that foul tips or liners may go in an entirely unexpected direction."

In the recent and well-considered case of Tite v. Omaha Coliseum Corp. 144 Neb. 22, 12 N. W. (2d) 90, 149 A. L. R. 1164, the court carefully and exhaustively examined prior cases relating to the respective duties of operators of public amusements and spectators who came to witness and be entertained thereby. Certain legal principles are there stated, with which we are in full accord. Said the court (144 Neb. 25, 12 N. W. [2d] 93):

"An operator of a place of public amusement is not an insurer of the safety of his patrons, but he owes them the duty which under the particular circumstances is ordinary and reasonable care for their safety. Such duty requires him to provide reasonable protection from and to warn his patrons of any dangers known to him, or which he should know in the exercise of reasonable care, and not known to his patrons, unless such dangers are observable to them in the exercise of reasonable care for their own safety." (Citing cases.)

And further (144 Neb. 29, 12 N. W. [2d] 95):

"A spectator at a hockey game assumes the risk of such dangers as are incident to the playing of the game of which he had knowledge or which should have been obvious and apparent to a reasonable and prudent person under the circumstances. An operator owes the spectator reasonable care for his safety but as a concomitant to this duty the spectator owes the duty to protect himself against known dangers or such dangers incident to the game as would be apparent to a reasonable person in the exercise of due care." (Citing cases.)

As to the distinguishing feature between baseball and hockey cases on the question of assumption of risk by the spectator, the court said (144 Neb. 30, 12 N. W. [2d] 95) :

"* * * An analysis of these cases reveals a definite trend of the courts to deny recovery for injuries received by spectators from balls going into unscreened stands from the playing field. The basis of the denial seems to be placed on the conduct of the spectator and culpability on his part. It seems to be predicated on the principle that a spectator with knowledge of the dangers incident to the playing of the game assumes the risk of being injured thereby, and this without regard to any negligence on the part of the operator. In those cases, however, in which the spectator denied actual knowledge of the dangers a recovery was not permitted because it was held that the circumstances surrounding his attendance were such and the game of baseball was so commonly known that knowledge was imputed to him and he was held to have assumed the hazards of the game. * * * While in some cases there was evidence that would show knowledge, the courts in deciding that the spectator had knowledge as a matter of law emphasized the fact that there is a common knowledge of baseball and its incidental dangers. This common knowledge seems to have been the deciding factor in causing the courts to view the question as one of law for the court rather than one of fact for the jury."

The court, after citing and discussing baseball and hockey cases and their similarity in respect to dangers from batted balls in baseball games and flying pucks in hockey games, came to the conclusion that

the dangers incident to spectators attending a game of hockey are not so general as to be matters of common knowledge. We need not cite or discuss the many cases there cited, since that opinion is readily available to all who care to study the subject matter further. We think, however, that the baseball cases should be followed here. Hockey is played to such an extent in this region and its risks are so well known to the general public that as to the question before us there is no difference in fact between the two games so far as liability for flying baseballs and pucks is involved. We think the reason for so holding is found in such cases as Hammel v. Madison Square Garden Corp. 156 Misc. 311, 279 N. Y. S. 815, 816, where the court said:

"No case has been found which passes upon this exact situation. There are, however, a number of cases where spectators at baseball games have been injured by batted balls coming into the stand. The concensus of opinion in those cases is that there is no liability; that the proprietors of a baseball park are not obliged to screen all the seats; that spectators occupying seats that are not screened assume the risk incident to such use." (Citing cases.)

To the same effect is Ingersoll v. Onondaga Hockey Club, Inc. 245 App. Div. 137, 281 N. Y. S. 505. In the Canadian case of Elliott and Elliott v. Amphitheatre Limited [1934] 3 West. Wkly. 225, the court said:

"The plaintiffs have to establish that there was negligence on the part of the defendant, and the question arises—what negligence have they proved? It is shown that the premises in which the game was played were constructed in the usual way, and *any danger through the playing is open and visible*. The defendant is bound only to keep the place in the same condition as other places of amusement of the like kind according to the best known mode of construction. There is no absolute duty to prevent danger, but only a duty to make the place as little dangerous as such a place could reasonably be having regard to the contrivances necessarily used in such a game." (Italics supplied.)

■ In the light of our prior cases involving baseball games, we conclude that plaintiff assumed the risks incident to the playing of a hockey game at the time and place in question and that the trial court was right in granting the motion for judgment.

Order affirmed.

[1]Reported in 29 N. W. (2d) 444.