Andrea MOULAS, Plaintiff-Appellant,†

v.

PBC PRODUCTIONS INCORPORATED, d/b/a Milwaukee Admirals, Fireman's Fund Insurance Company, Bradley Center Corporation and St. Paul Fire & Marine Insurance Company, Defendants-Respondents,

COMPCARE HEALTH INSURANCE CORPORATION, Defendant.

Court of Appeals

*No. 96–1784. Submitted on briefs July 1, 1997.—Decided September 23, 1997.*

(Also reported in 570 N.W.2d 739.)

†Petition to review granted.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *William A. Denny* and *Joseph S. Heino* of *Denny & Yanisch* of Elm Grove.

On behalf of the defendants-respondents the cause was submitted on the brief of *Michael D. Stotler* of *Bren, Nyberg & Thompson* of Milwaukee.

Before Wedemeyer, P.J., Fine and Curley, JJ.

WEDEMEYER, P.J.   Andrea Moulas appeals from a judgment entered after a summary judgment motion was granted in favor of PBC Productions Incorporated, Fireman's Fund Insurance Company (collectively, "the Admirals"), Bradley Center Corporation and St. Paul Fire & Marine Insurance Company (collectively, "the Bradley Center"), and Compcare Health Insurance Corporation, denying her claim for damages for injuries received when she was hit by a hockey puck while attending an Admirals hockey game.[1]

The Admirals and the Bradley Center moved for summary judgment based on the following propositions: (1) by assuming the risk of attending the hockey game in question, Moulas was more negligent than the defendants as a matter of law; (2) she was more negligent as a matter of law in exposing herself to an open and obvious danger; (3) public policy precludes liability; and (4) there is no evidence to support her claims. The trial court accepted each of these reasons as the basis for its order granting summary judgment.

Moulas claims that the trial court erred in each instance. Because Moulas has failed to meet the bur-

---

[1] The Admirals are a minor-league hockey team playing in the International Hockey League, which is a developmental league for the National Hockey League.

den of advancing specific evidentiary facts showing the presence of a genuine issue of material fact for trial, and because her contributory negligence is greater than the defendants, we affirm.[2]

## I. BACKGROUND

On October 21, 1994, Moulas, who was then thirty years old, was rendered unconscious and severely cut after being struck in the face by a hockey puck while watching an Admirals hockey game in Milwaukee's Bradley Center. The accident occurred while she was sitting in the second row of seats behind a Plexiglas screen. The hockey rink is enclosed by a clear plastic shield which extends twelve feet high around each end of the rink by the goal area and eight feet high in front of the midsection seating. Moulas was seated in this midsection area. She alleges that she did not see the flight of the puck before she was struck.

Moulas filed suit against the Admirals and the Bradley Center alleging that both were negligent, and that the Bradley Center additionally had violated the Safe Place Statute. *See* Chapter 101, STATS. The defendants moved for summary judgment which the trial court granted. The grounds for the summary judgment were that: (1) by assuming the risk of attending the hockey game, Moulas was more negligent than the defendants as a matter of law; (2) Moulas was negligent in exposing herself to an open and obvious danger; (3) public policy precludes liability; and (4) there was no evidence to support Moulas's claims. Moulas now appeals.

---

[2] We decide cases on the narrowest possible grounds. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514, 520 (Ct. App. 1989).

## II. ANALYSIS

*A. Issues of Material Fact.*

We begin our analysis by iterating the well-recognized principle that a grant of summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* § 802.08(2), STATS. If the movant can demonstrate by any of the aforementioned means that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the opposing party—to avoid summary judgment—must set forth specific facts showing that there is a genuine issue of material fact for trial. *See* § 802.08(3), STATS. Amplifying this rule in *Transportation Insurance Co. v. Hunzinger Construction Co.*, 179 Wis. 2d 281, 507 N.W.2d 136 (Ct. App. 1993), we stated: "Other times, however, a party moving for summary judgment can only demonstrate that there are no facts of record that support an element on which the opposing party has the burden of proof, but cannot submit specific evidentiary material proving the negative." *Id.* at 291, 507 N.W.2d at 140. Such a phenomenon, however, is not fatal. When, due to the context of the motion, this condition exists, we noted "it is the burden of the party asserting a claim on which it bears the burden of proof at trial 'to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Id.* at 291–92, 507 N.W.2d at 140 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Stated otherwise, once the motion is made and demonstrates the support required by the

statute, the opponent does not have the luxury of resting upon its mere allegation or denials of the pleadings, but must advance specific facts showing the presence of a genuine issue for trial. In examining the affidavits for the ascertainment of evidentiary facts only that evidence may be considered "as would be admissible" at trial. *Leszczynski v. Surges*, 30 Wis. 2d 534, 539, 141 N.W.2d 261, 265 (1966). "[E]videntiary facts stated in the affidavits are taken as true if not contradicted by other opposing affidavits or proof." *Id.* With these principles in mind, we now examine the submissions of the parties.

The complaint filed by Moulas alleges that the Admirals and the Bradley Center were negligent in one or more of the following respects: (1) by allowing hockey pucks to leave the ice rink and to endanger spectators of Milwaukee Admirals hockey games including the plaintiff; (2) in failing to provide adequate protection for spectators of Milwaukee Admirals hockey games against hockey pucks which are known to the defendants to forcibly leave the ice rink from time to time; and (3) failing to take such other steps as were available prior to October 21, 1994, for the purpose of avoiding or minimizing injury from hockey pucks to spectators of Milwaukee Admirals hockey games. In addition, Moulas alleged that the Bradley Center, as the owner of a place of employment and of a public building, owed her as a frequenter of the building, "the non-delegable duty to keep that place as safe as its nature would permit. It breached this duty and such breach caused injuries to her."

To support its motion for summary judgment, the Admirals and the Bradley Center filed four affidavits: one each of N. Thomas Berry, Jr., Thomas Dieckelman, Keith Moore and Attorney William J. Richards.

The Berry affidavit consists of nine paragraphs. In it, Berry affirms that, as of June 1, 1994, he began serving as Senior Vice President and Director of Hockey Operations for the International Hockey League, having previously served as League President, Director of Officiating and in other capacities. Paragraphs five through seven, based on personal knowledge, state that the Bradley Center's sideboards and Plexiglas walls are designed for and comply with the National and International Hockey League rules. If the boards and walls were modified, they would no longer comply with league rules and games would not be allowed to be played at the Bradley Center. Paragraphs eight and nine consist of opinion statements as to the safety of the rink.

The affidavit of Dieckelman consists of ten paragraphs and is given in his capacity as Assistant General Manager of the Admirals. Attached to the affidavit are several documents: excerpts from the program booklet for the 1994 season, disclaimer language on the back of each admission ticket, and a copy of the lease with the Bradley Center.

The excerpt from the program booklet, page 13, contains the following advisory: "A Special Reminder: Fans, Please Keep Your Eyes On the Puck at **All** Times." The disclaimer language on the back side of each admission ticket reads:

> Ticketholder expressly assumes all risks and danger incidental to the game of hockey, whether occurring prior to, during or subsequent to the actual playing of the game, including specifically (but not exclusively) the danger of being injured by hockey pucks and sticks . . . . P.B.C. Productions, Inc., dba Milwaukee Admirals, Bradley Center Corporation, International Hockey League . . . their

officers, directors, agents and employees, are expressly released by ticketholder from claims arising from or in any way connected to the foregoing.

Paragraphs eight through ten then include opinions given without foundation regarding the safety of the boards and screening.

Moore's affidavit consists of three paragraphs and is made in his capacity as the Public Address Announcer for the Admirals on October 21, 1994, when Moulas was injured. Attached to his affidavit is a copy of the script which he affirms was read at the beginning of each and every period of a hockey game, including the night of the injury. The announcement reads:

Fans, for your safety we ask that you please keep both eyes on the puck when you are seated in your area. It is for your safety that you please keep your eyes on the puck when it is in play at ALL times. The Admirals and the Bradley Center appreciate your cooperation.

The affidavit of the Admirals and Bradley Center counsel, William J. Richards, is prefatory to submitting fourteen pages from Moulas's deposition. In summary, the excerpted portions reveal that Moulas had attended over ten previous hockey games before October 21. She knew that the puck could leave the ice during games and strike the Plexiglas screen that separates the rink from the spectator area. She had witnessed pucks flying into the spectators' sections and had previously discussed the occurrences with friends and her brother. Prior to the night of the accident, she had heard the public address announcer warn that spectators should keep their eyes on the puck at all times. We shall revisit these evidentiary facts in the second part of this opinion.

413

In response, Moulas filed five affidavits: (1) her own; (2) that of her brother, Gust Moulas; and (3) those of her two counsels containing extracts from the depositions of Phillip Witliff, the Admirals' Head Coach and General Manager; Tom Dieckelman, Assistant General Manager; Keith Moore, the Admirals' announcer; and pictures of the seating area where the accident occurred.

The affidavit of Andrea Moulas consisted of thirteen paragraphs. The first paragraph identified her as the plaintiff in this action. The second paragraph recites the nature of her claim. The third paragraph describes her injuries. Paragraph four explains her seating location behind an eight-foot screen on the side of the rink. The last sentence of the paragraph expresses personal speculation about the possibility of being hit by a puck. Paragraph five avers that the reason for the seat location was to avoid the risk of being hit by a flying puck. In paragraph six she opines about the inadequate safety behind the eight-foot screen. Paragraph seven acknowledges that she had previously witnessed other people being struck by pucks, but claimed lack of awareness as to the nature of any injuries sustained. In paragraph eight she expresses her disbelief of any risk where she was seated. In paragraph nine she states she never took the time to read the disclaimer language on the back of her tickets but, now having read it, concludes that there is no expression about the extreme danger to which she had been subjected. In paragraphs ten through thirteen she denies knowing of the warning contained in the program booklet, in the public address announcement, or the risk involved where she was seated.

The affidavit of Moulas's brother, Gust, consists of eleven paragraphs. In the first three, he identifies him-

self as a police officer, relates the reason he bought the particular season tickets close to the rink (i.e. for protection), and the circumstances of attending the game on October 21, 1994. To the affidavit he attached two photographs depicting both the eight-foot and twelve-foot screening. Each picture is marked with an "X" indicating where his sister sat at the time of the accident. He further states that he did not see the puck strike his sister, but saw the puck at the time it was hit and where it started its trajectory path outside the rink. The balance of his affidavit consists of speculation about the likelihood of being hit by a puck in his seat, a conclusion about the flight path of the puck which struck his sister, projected costs for labor and material to replace the eight-foot screening with twelve-foot screening, and his opinion as to the proximate cause of his sister's injuries. Absent from his affidavit is any stated basis to assume expertise on his part in hockey arena design or any standard of care for such a facility and any breach of any safety or maintenance standard.

The affidavit of attorney Denny is essentially comprised of two parts. The first part contains historical evidentiary facts relating to the number of puck-associated injuries at the Bradley Center, the absence of any warning signs, and the maximum speed a puck can travel when propelled by a player. The second part describes the type of screening at the Pettit National Ice Center in comparison to that at the Bradley Center and is couched in argumentative, conclusory form. Unless this portion of his affidavit is supported by proper foundation—i.e. Denny's expertise in design and usage standards—it does not rise to the level of evidentiary facts.

The affidavit of Moulas's other counsel, Joseph S. Heino, consists of five paragraphs. After an introduc-

tion, paragraphs two through five provide segments of depositions taken from Witliff, Dieckelman, Moore, and Frances Eddy, the Admirals' ticket manager.

The essence of the segment of Witliff's deposition is that he knew no reason why Plexiglas screening could not be built higher than eight feet. The excerpts from Dieckelman's deposition corroborate other affiants' statements that spectators were warned about errant pucks by announcements at the games, a message on the video scoreboard and disclaimer language on the back of the tickets. He knew of no reason why signs were not posted warning patrons of the danger from pucks leaving the ice. He also responded to a question that his source for believing that the league rules prohibited side screening higher than eight feet was the former league commissioner, Thomas Berry.

The next depositional excerpt presented testimony of Moore, the announcer. The transcript points to a contradiction on Moore's part as to whether he reads the warning about flying pucks before the beginning of every period or only occasionally, and whether the script he referred to in his affidavit was the actual one used the night of the accident. The last testimonial excerpt presented is that of Eddy who knew no reason why twelve-foot screening could not be used where the eight-foot screen was in place at the time of the accident.

█

Frequently in summary judgment proceedings, the best defense is a weak offense. From our review of the parties' submissions, we conclude that the evidence fails to create a genuine issue of material fact for trial. Doubtless, Moulas sustained a serious injury from an errant puck. Doubtless also, the screening could have reached from the rink floor to the Bradley Center's

ceiling. But, the fact that the accident occurred does not establish fault. The "mere happening of an accident does not automatically establish that a place is not safe within the meaning of the safe place statute or that someone was negligent under the common law." *McGuire v. Stein's Gift & Garden Center, Inc.*, 178 Wis. 2d 379, 397–98, 504 N.W.2d 385, 392–93 (Ct. App. 1993). We do not subscribe to "post hoc, propter hoc."

From our examination of Moulas's submissions, we conclude they are woefully lacking in any competent evidence demonstrating the existence of any standards of care, or standards of design and maintenance—and the breach thereof—to raise any issue of genuine material fact. Personal opinions of an affiant in the absence of a validating basis do not constitute evidentiary facts. *See Snider v. Northern States Power Co.*, 81 Wis. 2d 224, 231, 260 N.W.2d 260, 263 (1977). Without adequate foundation to support these opinions they cannot stand as evidentiary facts. *See id.* "An affidavit opposing a motion for summary judgment is insufficient if it sets forth only opinion." *Dean Medical Center, S.C. v. Frye*, 149 Wis. 2d 727, 732–33, 439 N.W.2d 633, 635 (Ct. App. 1989). Nor do the affidavits of the plaintiff, the deposition excerpts of Witliff, Dieckelman, Moore or Eddy supply the necessary evidentiary facts to create a genuine issue of material fact. These affidavits setting forth unsupported opinion do not meet the definition of a "material fact" found in Wisconsin law. *See Clay v. Horton Mfg. Co.*, 172 Wis. 2d 349, 354, 493 N.W.2d 379, 381 (Ct. App. 1992) (stating that the alleged factual dispute must concern a fact that affects the resolution of the controversy). Moulas has simply not met her burden. *See Hunzinger*, 179 Wis. 2d at 291, 507 N.W.2d at 140.

417

## B. Contributory Negligence.

■

In addition, the undisputed facts support the trial court's determination that Moulas cannot maintain a claim because her contributory negligence exceeds any negligence on the part of the defendants. Pertinent to its conclusion, the trial court stated:

> [A]ssumption of risk is an element of ordinary negligence and that's asserted in *Polsky V. Levine*, 73 Wis. 2d 547, page 552, a 1976 case . . . .
>
> The baseball rule, in *Powless V. Milwaukee County*, 6 Wis. 2d 78, a 1957, was decided upon contributory negligence grounds not simply assumption of risk. That doesn't mean it wasn't a factor.
>
> . . . .
>
> Plaintiff did recognize the [risk of the] situation. She recognized the risk in a specific situation with which she found herself but she[ ] didn't recognize the risk of how badly one could be injured by a hockey puck, but she's as I said, the standard is the reasonable person standard and I think the reasonable person who attends hockey games or wants to attend a hockey game [ ] and know[s] where the puck is, if you ever lifted one of these things, one wouldn't want to be sitting in the path of someone hitting a hockey puck. . . .
>
> Court finds her negligence as a matter of law is greater than that of the defendant based on the baseball rule . . . .

We agree with the trial court that the "baseball rule" applies here. Essentially, the baseball rule prohibits a spectator who is injured by a flying baseball to make a claim against the team or other responsible parties. *See Powless v. Milwaukee County*, 6 Wis. 2d 78, 84, 94

418

N.W.2d 187, 190 (1959). Although some jurisdictions rely on assumption of risk principles when applying the baseball rule, *see, e.g. Pestalozzi v. Philadelphia Flyers, Ltd.*, 576 A.2d 72 (1990), and Wisconsin has abolished assumption of risk as an absolute defense, *see Kloes v. Eau Claire Cavalier Baseball Association, Inc.*, 170 Wis. 2d 77, 86, 487 N.W.2d 77, 81 (Ct. App. 1992), we nevertheless conclude that the articulated basis of the baseball rule warrants its application to hockey. As noted by the trial court, assumption of risk is an element of contributory negligence. Therefore, its abolition as an absolute defense does not preclude its consideration as a part of a contributory negligence analysis.

Here, Moulas does not deny that she was aware of the risk of an errant puck causing injury. She admits that she had attended at least ten Admirals games in the past, she was aware that the puck may leave the ice and fly into the spectator area, she heard the announcer's warnings about watching the puck to avoid injury and she chose to sit in the second row because she wanted to avoid getting hit by an errant puck. From these factors, Moulas was conscious of the risk, even though she may not have known the degree of risk. Despite these risk factors, Moulas voluntarily chose to attend the hockey game on October 21. Her assumption of this risk is an element to consider in assessing her contributory negligence.

In addition to the aforementioned, Moulas was given a ticket that referenced the dangers and released the responsible parties from liability. Programs were available which also warned of the dangers associated with errant pucks. Hockey, like baseball before it, is quickly gaining popularity as a cherished form of entertainment in our sports-oriented culture. As noted

by the trial court, "If we're going to enjoy sports, . . . we're not going to make them unduly burdensome for owners of teams to present to the public. We have to take a look at what the viewing public has as a responsibility here."

We agree with the reasoning espoused in *Modec v. City of Eveleth*, 29 N.W.2d 453 (Minn. 1947):

> When the puck is passed from player to player across the playing area, it often rises from the ice. Since the puck is round with a flat bottom and top, it is not always possible for a particular player to determine the direction the puck will take when in flight, nor how high it will rise. Any person of ordinary intelligence cannot watch a game of hockey for any length of time without realizing the risks involved to players and spectators alike.
>
> . . . .
>
> Hockey is played to such an extent in this region and its risks are so well known to the general public that as to the question before us there is no difference in fact between [hockey and baseball] so far as liability for flying baseballs and pucks is involved.

*Id.* at 455–56. Because the risks associated with hockey should be known to the reasonable person attending a game, because Moulas was aware of the risks, and because she chose to attend despite her knowledge and the warnings espoused, we conclude that summary judgment was appropriate. Moulas's contributory negligence—as a matter of law—was at least 1% more than any of the defendants.[3]

_____

[3] In reaching this conclusion, we caution that we are not resurrecting the "assumption of risk doctrine" as an absolute bar to a potential claim. Rather, we rely on the assumption of

## III. CONCLUSION

In sum, we affirm the trial court's grant of summary judgment for two reasons. First, Moulas failed to demonstrate that there are any material issues of fact to present to a jury on either of her claims. She failed to show what safety violations exist in support of her safe place claim and she has failed to present any evidentiary facts to support her negligence claim. Second, we conclude that under the circumstances presented here, Moulas's negligence exceeds the defendants' negligence as a matter of law. Accordingly, the trial court properly granted the defendants' motion for summary judgment and we affirm.[4]

*By the Court.*—Judgment affirmed.

FINE, J. *(dissenting)*. As framed by the majority opinion, this appeal presents one narrow issue: Whether PBC Productions has demonstrated that it is entitled to summary judgment because of the so-called "baseball rule" adopted by *Powless v. Milwaukee County*, 6 Wis. 2d 78, 94 N.W.2d 187 (1959). In my view, it has not. Accordingly, I respectfully dissent.

*Powless* held that a spectator at a baseball game who chooses to sit in an area that is not protected from batted balls may not recover if struck by a batted ball. *Id.*, 6 Wis. 2d at 83–86, 94 N.W.2d at 190–191. The

---

risk attendant here only as it impacts on Moulas's contributory negligence.

[4] We note that the dissent states "As framed by the majority opinion, this appeal presents one narrow issue": whether the baseball rule applies. *See* dissent p. 421. We emphasize that our decision is two-fold: (1) that Moulas failed to show there is a material issue of genuine fact; and (2) that the baseball rule applies.

421

plaintiff in *Powless* was denied recovery because "[s]he made no effort to obtain a seat behind the back-stop screen although she knew that seats in that area are available." *Id.*, 6 Wis. 2d at 83, 94 N.W.2d at 190.

If applicable, the "baseball rule" would defeat Moulas's claims. It is therefore an affirmative defense, *see* RULE 802.06, STATS. PBC Productions thus has the burden of proof on whether the "baseball rule" applies. *See Estate of Anderson*, 147 Wis. 2d 83, 88, 432 N.W.2d 923, 926 (Ct. App. 1988) (defendant has burden of proving facts that would defeat plaintiff's claim).

Affidavits submitted by Andrea Moulas raise a genuine issue of material fact as to whether 1) she tried to protect herself by sitting in a seat that she believed was safely screened from flying pucks; and, if so, 2) whether that belief was reasonable. These affidavits assert:

- Moulas was sitting in season seats purchased by her brother.

- Moulas's brother purchased those seats "to be as close as possible to the plastic screen surrounding the rink."

- Moulas's brother "thought that it was not possible for a puck to hit a person sitting in [his] season seats."

- It was Moulas's "understanding" that her brother selected the seats "in the second row behind the screen so that users of the season tickets would not be in danger of being hit by a flying puck."

- At the time she was hit by the puck, Moulas was sitting in "the second row of seats immediately behind the 8 foot high plastic screen along the side of the ice rink" "for protection from any hockey puck that might be hit out of the rink."

422

- Moulas's "head was below the top of the screen" when the puck hit her.

- At the time she was hit by the puck, Moulas "felt totally secure from the possibility of being hit by a puck leaving the rink."

- According to Moulas's brother, "[k]nowing where the puck started its exit from the rink and where it hit [Moulas], it is obvious that the puck just barely cleared the 8 foot high screen and then arced down to hit [Moulas]."[1]

We must view these sworn averments in a light most favorably to the plaintiff. *See DeRuyter v. Wisconsin Electric Power Co.*, 200 Wis. 2d 349, 359, 546 N.W.2d 534, 539 (Ct. App. 1996). Thus read, they support Moulas's contention that she, unlike the plaintiff in *Powless*, made an "effort to obtain a seat behind the [safety] screen." *See Powless*, 6 Wis. 2d at 83, 94 N.W.2d at 190. Thus, at this stage of the proceedings the "baseball rule" does not bar her claims, although, of course, the jury should be instructed on that defense.

I would reverse the trial court's grant of summary judgment, and remand for trial.

---

[1] This opinion admissible under RULE 907.01, STATS.