**Perry and Mary Margaret PETRONGOLA, Husband and Wife, Appellants**

v.

**COMCAST–SPECTACOR, L.P., Spectrum Arena Limited Partnership and Philadelphia Phantoms Limited Partnership, Appellees.**

Superior Court of Pennsylvania.

Argued Oct. 3, 2001.

Filed Nov. 28, 2001.

Thomas A. Lynam, Philadelphia, for appellants.

Jonathan Dryer, Philadelphia, for appellees.

BEFORE: MCEWEN, President Judge Emeritus, JOYCE and KELLY, JJ.

KELLY, J.:

¶ 1 Appellant [1], Perry Petrongola, asks us to determine whether the trial court

---

**1.** We note that Appellant's wife, Mary Margaret Petrongola, is also a party to this case.

erred in finding Appellees, as owners and operators of a hockey arena, owed "no duty" to protect Appellant from an errant puck that struck him in the mouth during the course of a hockey game. In addition, we must determine if a question exists as to whether Appellees assumed a duty to protect Appellant from that errant puck. Finally, Appellant asks us to decide whether the trial court improperly relied on the "assumption of the risk" defense in granting Appellees' motion for summary judgment, and whether the trial court erred in granting Appellees' motion for summary judgment after it had previously denied Appellees' motion for judgment on the pleadings.

¶ 2 We hold that Appellees had "no duty" to protect Appellant from an errant puck entering the seating portion of the arena, as such instances are a common, frequent, and expected occurrence at a hockey game; the Spectrum hockey facility did not deviate from any established custom of safety that would give rise to liability for the injuries sustained by Appellant; Appellees did not assume a duty to protect Appellant merely by erecting a plexiglass shield around the ice surface; and the trial court did not improperly rely on the "assumption of the risk" defense in granting Appellees' motion for summary judgment. Finally, we hold that it was proper for the trial court to grant Appellees' motion for summary judgment al-

though it had previously denied Appellees' motion for judgment on the pleadings. Accordingly, we affirm the trial court's order granting Appellees' motion for summary judgment.

¶ 3 The relevant facts and procedural history of this case are as follows. Appellant, Perry Petrongola, was a Philadelphia Phantoms season ticket holder. Appellee, Comcast–Spectacor, L.P., owns the CoreStates Spectrum. The Philadelphia Phantoms' home arena is the CoreStates Spectrum. The playing surface at the Spectrum is almost entirely surrounded by a shield of plexiglass and dasher boards[2] that extend from the ice surface to a height of nine (9) feet. However, the dasher boards directly in front of the players' benches do not contain the plexiglass shield so that the players may freely move from the ice to the bench, and vice-versa, during the game. Additionally, the path that leads from the players' bench to the players' locker room has a five-foot gap[3] where no plexiglass was ever erected. On October 10, 1997, Appellant was seated in his season seat, which is located adjacent to the tunnel that leads from the bench to the players' locker room. During the game an errant puck traveled through the five-foot gap in the plexiglass and struck Appellant in the mouth.

¶ 4 On November 30, 1999, Appellant filed a civil complaint against Appellees

Her claims, however, are entirely dependent upon Perry Petrongola's claims. Thus, for purposes of this appeal, we will address both parties as Appellant. Our ruling, however, is binding upon Mary Margaret Petrongola.

2. Dasher boards are panels four feet high, which surround the ice rink. The plexiglass shield is attached to the top of the dasher boards.

3. In parts of his brief Appellant asserts that the "gap" in the plexiglass is five feet wide, in other parts, he asserts that the "gap" is twen-

ty-five feet wide. After viewing the pertinent photos in the record, we conclude that the gap, clearly, does not reach a width of twenty-five feet. We will use Appellant's assertion of five feet for purposes of this opinion. (See Exhibit A attached to Appellant's Response to [Appellees'] Motion for Judgment on the Pleadings; R.R. 59a–62a). In addition, Appellant's reproduced record does not contain the proper pagination. See Pa.R.A.P. 2173, Numbering of Pages. For that reason we have added the suffix "a" when citing to a page from Appellant's reproduced record.

alleging that as a result of the incident, he suffered damage to his teeth and mouth, which necessitated a significant amount of stitches and dental work. Appellant also alleged he suffered an injury to his back, which required surgery. Appellant claimed that his injuries were suffered as a result of Appellees' negligence. On June 1, 2000, Appellees filed a motion for judgment on the pleadings, asserting they had "no duty" under Pennsylvania law to protect Appellant from risks to spectators inherent in the game of hockey. The trial court denied this motion. After the parties completed discovery, Appellees filed a motion for summary judgment. Again, Appellees cited the "no duty" rule in their motion. Appellant also filed a motion for summary judgment. On January 23, 2001, the trial court granted Appellees' motion for summary judgment, denied Appellant's motion for summary judgment, and dismissed the case with prejudice. This timely appeal followed.

¶ 5 On appeal, Appellant raises the following issues for our review:

> WHETHER THE TRIAL COURT'S APPLICATION OF THE "NO DUTY" RULE IN THIS CASE WAS IN ERROR?
>
> WHETHER THE [APPELLEES,] BY THEIR CONDUCT[,] ASSUMED A DUTY TO [APPELLANT,] MR. PETRONGOLA, PURSUANT TO THE RESTATEMENT OF TORTS (SECOND) § 324?
>
> WHETHER THE TRIAL COURT'S RELIANCE UPON THE ASSUMPTION OF THE RISK DEFENSE WAS MISPLACED IN THIS CASE?
>
> WHETHER THE DENIAL OF THE [APPELLEES'] MOTION FOR JUDGMENT ON THE PLEADINGS ESTABLISHED THE LAW OF THE CASE AND THEREBY PRECLUDED THE TRIAL COURT FROM ENTER-TAINING OR GRANTING [APPELLEES'] MOTION FOR SUMMARY JUDGMENT WHICH WAS BASED ON THE EXACT SAME ISSUE WITH NO NEW EVIDENCE OR CASE LAW?

(Appellants' Brief at 4).

■■■ ¶ 6 Summary judgment is governed by the Pennsylvania Rules of Civil Procedure as follows:

### RULE 1035.2 MOTION

After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
>
> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2 A proper grant of summary judgment depends upon an evidentiary record that either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the jury. Pa. R.C.P. 1035.2 *Note.* Where a motion for summary judgment is based upon insufficient evidence of facts, the adverse party must come forward with evidence

essential to preserve the cause of action. If the non-moving party fails to come forward with sufficient evidence to establish or contest a material issue to the case, the moving party is entitled to judgment as a matter of law. The non-moving party must adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict favorable to the non-moving party. As with all summary judgment cases, the court must examine the record in the light most favorable to the non-moving party and resolve all doubts against the moving party as to the existence of a triable issue.

Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. In reviewing a grant of summary judgment, the appellate court may disturb the trial court's order only upon an error of law or an abuse of discretion. The scope of review is plenary and the appellate court applies the same standard for summary judgment as the trial court.

*McCarthy v. Dan Lepore & Sons Co., Inc.,* 724 A.2d 938, 940–41 (Pa.Super.1998), *appeal denied,* 560 Pa. 707, 743 A.2d 921 (1999) (some internal citations omitted). *See also Moses v. T.N.T. Red Star Exp.,* 725 A.2d 792 (Pa.Super.1999), *appeal denied,* 559 Pa. 692, 739 A.2d 1058 (1999).

¶ 7 In his first issue, Appellant asserts that the trial court erred when it applied the "no duty" rule in granting Appellees' motion for summary judgment. Appellant argues that but for the design and maintenance of the playing area, the speeding hockey puck would not have caused Appellant's injuries. In support of this contention, Appellant presented (1) the opinion of

an expert, Steve Bernheim (*see* letter dated November 20, 2000, attached as Exhibit C to Appellees' Motion for Summary Judgment; R.R. 114a–116a); (2) the "Standard Guide for Ice Hockey Playing Facilities," issued by the American Society for Testing Materials (ASTM) (*see* ASTM Designation F1703–96, attached as Exhibit F to Appellees' Motion for Summary Judgment; R.R. 126a–132a); and (3) the 1996–97 Official Rules for the A.H.L. (*see* A.H.L. Official Rules, attached as Exhibit G to Appellant's Response to Appellees' Motion for Summary Judgment; R.R. 202a–203a). Mr. Bernheim contends that Appellees had a duty to abide by the ASTM standards, and that Appellees failed to do so in maintaining the Spectrum hockey facility. (*See* Exhibit C, *supra*) Specifically, Bernheim states that the bench area should have been equipped with a plexiglass shield "extending six feet above the dasher board panel." (*Id.*) In addition, Appellant asserts ASTM standard F1703–96 [(5.4)] [4] mandates that plexiglass surrounds the players' boxes. (Appellant's Brief at 16). Finally, Appellant claims that the gap in the plexiglass violated a league rule that requires a shield to protect the spectators. Appellant submits that the Spectrum's hockey configuration, therefore, deviated in some relevant way from an established custom, and that deviation caused Appellant's injuries. For these reasons, Appellant concludes that the trial court erred in granting Appellees' motion for summary judgment. We disagree.

¶ 8 To recover under a claim for negligence, the plaintiff must prove the following elements: "that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the

---

4. Appellant refers to this section as (5.5). The ASTM Standards do not contain a rule

F1703–96 (5.5). Section (5.4), however, mimics Appellant's assertion.

plaintiff suffered an actual loss or damage." *Martin v. Evans,* 551 Pa. 496, 502, 711 A.2d 458, 461 (1998).

> Whether a duty exists under a particular set of facts is a question of law. It has long been hornbook law that a duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others.

> When considering the question of duty, it is necessary to determine whether a defendant is under any obligation for the benefit of the particular plaintiff ... and, unless there is a duty upon the defendant in favor of the plaintiff that has been breached, there can be no cause of action based upon negligence. Whether a duty exists is ultimately a question of fairness. The inquiry involves weighing the relationship of the parties, the nature of the risk and the public interest in the proposed solution. Our duty analysis depends on many factors and is necessarily rooted in public policy considerations, i.e., our ideas of history, morals, justice, and society in general in determining where the loss should fall.... Furthermore, duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the question.... To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times.

*Herczeg v. Hampton Tp. Mun. Authority,* 766 A.2d 866 (Pa.Super.2001) (quoting *Campo v. St. Luke's Hosp.,* 755 A.2d 20, 24 (Pa.Super.2000), *appeal denied,* 564 Pa. 723, 766 A.2d 1242 (2001) (citations and quotation marks omitted)).

¶ 9 A review of cases from outside this jurisdiction reveals that there is a wide variation of rules relating to the duty owed by owners of hockey arenas to their patrons, ranging from "no duty" to an ordinary duty of care. *See Schneider v. American Hockey and Ice Skating Center,* 342 N.J.Super. 527, 777 A.2d 380 (App.Div. 2001) (holding hockey arenas have "limited duty" and must provide "protected seating" for those who request it and for spectators in "most dangerous" section of stands); *Teneyck v. Roller Hockey Colorado, Ltd.,* 10 P.3d 707 (Colo.App.2000) (finding "no duty" rule inapplicable where legislature enacted premises liability statute and exempted baseball stadiums, and ski resorts, but not hockey arenas); *Riley v. Chicago Cougars Hockey Club, Inc.,* 100 Ill.App.3d 664, 56 Ill.Dec. 210, 427 N.E.2d 290 (1981) (holding "no duty" rule inapplicable because of "fundamental differences" between baseball and hockey); *Modec v. City of Eveleth,* 224 Minn. 556, 29 N.W.2d 453 (1947) (holding limited duty of care owed because spectators assume risk of being hit with puck at hockey game); *Ingersoll v. Onondaga Hockey Club, Inc.,* 245 A.D. 137, 281 N.Y.S. 505 (N.Y.A.D.1935) (holding owners of hockey arena have no duty to protect spectators from dangers incident to the game).

■■■ ¶ 10 In Pennsylvania, the law imposes "no duty" on sports facilities to protect spectators from risks that are common, frequent, and expected. *Jones v. Three Rivers Management Corp.,* 483 Pa. 75, 85, 394 A.2d 546, 551 (1978). However, a facility may be held liable if the design of the facility deviates from the established custom in some relevant way. *Id.* at 84, 394 A.2d at 550.

¶ 11 In *Jones,* a ball struck a patron as she walked through an interior walkway of the stadium during batting practice. The Supreme Court held that the "no duty" rule was inapplicable to the facts of that case, noting that the ball struck the patron through a unique opening built into the outfield wall. *Id.* at 86, 394 A.2d at 551–

552. The Court stated that this feature of the stadium was not "an inherent feature of the spectator sport of baseball." *Id.* The Court held that a patron cannot be "charged with anticipating as inherent to baseball the risk of being struck by a baseball while properly using an interior walkway." *Id.* A plaintiff, therefore, is not foreclosed from bringing a suit for negligence against the operator of a sports facility if the plaintiff can introduce "adequate evidence that the [facility] in which he was injured deviated in some relevant respect from the established custom." *Id.* at 84, 394 A.2d at 550.

¶ 12 More recently, courts of this jurisdiction have addressed the issue of liability for injuries sustained by patrons while seated in a stadium during a game. In *Telega v. Security Bureau, Inc.*, 719 A.2d 372 (Pa.Super.1998), *appeal denied*, 560 Pa. 687, 742 A.2d 676 (1999), this Court refused to apply the "no duty" rule in a case where fans pummeled a spectator in an attempt to retrieve a football that entered the stands from the playing field. This Court reiterated the fact that the "no duty" rule only applies to injuries sustained from risks inherent to the game being played. *Id.* at 376. Significantly, this Court held, "unlike the risk of being struck by an errant puck ... at a hockey game," being attacked by an unruly mob at a football game was not an inherent risk associated with the activity. *Id.* at 377 (emphasis added) (citing *Pestalozzi v. Philadelphia Flyers Ltd.*, 394 Pa.Super. 420, 576 A.2d 72, 74 (1990)).

¶ 13 The *Pestalozzi* case is strikingly similar to the present case. In *Pestalozzi* an errant hockey puck struck the plaintiff as he was seated close to the ice, but behind the plexiglass. *Id.* In ruling that such risks were so inherent in the game of hockey as to be considered "common, frequent, and expected," the Court opined:

Unlike the spectator in *Jones,* [*supra,*] appellant was struck by the relevant orb while sitting in close proximity to the playing surface. Also, appellant, unlike his compatriot in *Jones,* was struck during the course of the game. We reject appellant's contention that appellee was liable for his injuries since he [appellant] sought to avoid injury by purchasing seats behind the protective plexiglass. Our review of the record reveals that appellant had previously attended a professional hockey game and should have been familiar with the inherent risks involved. **We find, therefore, that the risk of a spectator being struck by an errant puck, even for an individual sitting behind plexiglass, is common and reasonably foreseeable. Thus, we conclude that appellant assumed the risk of being struck by a flying puck.** *Id.* at 74. (emphasis added).

¶ 14 In the instant case, being struck by a puck while seated in attendance at a hockey game is an inherent risk associated with the game. *See id.* Appellant was a season ticket holder with the Phantoms. He regularly attended the games and knew that pucks can, and often do, leave the ice during play, and enter the stands. Unlike the plaintiff in *Jones, supra,* the puck struck Appellant while he was seated in his regular seat, during the course of the game. That Appellant's selected seats were only partially protected by a plexiglass shield does not alter or diminish the fact that the risk of being hit by an errant puck is, as a matter of law, a "common, frequent, and expected" part of the game. *See Pestalozzi, supra.*

¶ 15 Moreover, the standard enunciated in *Jones, supra,* is that the design must deviate from the established custom in some relevant way. The ASTM standards state (*see* Exhibit F, *supra;* R.R. at 126a), and Mr. Bernheim concedes (*see* Exhibit

C, *supra;* R.R. at 115a), that these standards were not adopted until 1996.

¶ 16 The ASTM guide states in part "1. Scope ... [that] [t]he intent is to provide consistent safety considerations in the design and construction of **new** ice hockey rinks." (Exhibit F, *supra;* R.R. at 126a) (emphasis added) In its *Introduction,* the ASTM guide states that it is in the "interest of **future** standardization" that all **new** facilities abide by the dimensions set forth in the guide. (*Id.* (emphasis added)). The ASTM manual also states that these standards apply to the "development of new arenas and to existing arenas that will be renovated." (*Id.*) Nowhere do the standards demand that all existing facilities be immediately reconfigured to conform to these newly promulgated standards.

¶ 17 The Spectrum's hockey configuration is approximately 30 years old. Assuming, *arguendo,* that the ASTM guide proffered by Appellant sets the standards for AHL [5] hockey arenas constructed after 1996, the ASTM "Standard Guide for Ice Hockey Playing Facilities, Designation F1703–96" does not set the established custom for design and maintenance of pre–1996 facilities such as the CoreStates Spectrum hockey facility.

¶ 18 The A.H.L. rules proffered by Appellant state that the players "shall be separated from the spectators by a protective glass of sufficient height **so as to afford the necessary protection for the players**." (Exhibit G, supra; R.R. 203a (emphasis added)) The question before us today does not involve protection for the players; it involves protection for the spectators. Here, Appellant is required to show that the Spectrum deviated from the established custom in some **relevant** way. *See Jones, supra.* However, the rule cited by Appellant makes no reference to the

established regulations regarding protection of the spectators. Moreover, the ASTM standards relied upon by Appellant recognize that "there are a wide variety of playing facilities currently in use, accompanied by wide disparities in margins of safety to players and game officials." (Exhibit F, *supra;* R.R. 126a) The no duty rule applies to situations that are common, frequent, and expected. "Most importantly, the Courts have found Appellant is required to introduce evidence that the amusement, facility in which he was injured deviated in some relevant aspect from the established custom before the case can go to the jury. Appellant failed in this respect." *See Telega, supra* at 377 (Joyce, J., dissenting) (internal citation omitted). Appellant's first claim, therefore, warrants no relief.

¶ 19 Next, Appellant argues that even if the "no duty" rule applies, Appellees assumed a duty of care for Appellant by erecting a plexiglass shield around the rest of the ice. Appellant asserts that Appellees did not act reasonably once they assumed that duty. Therefore, Appellees should be liable for Appellant's injuries. Appellant cites Restatement (Second) of Torts § 324 as support for this argument. Appellant concludes that this argument raises a genuine issue of material fact, which precludes judgment in favor of Appellees as a matter of law. We disagree.

¶ 20 The Restatement (Second) of Torts § 324 states:

> One who, being under no duty to do so takes charge of another who is helpless to adequately aid or protect himself is subject to liability to the other for any bodily harm caused by him by (a) the failure of the actor to exercise reasonable care to secure the safety of the

---

**5.** AHL is the "American Hockey League." Appellee, Philadelphia Phantoms, play in the AHL which is a farm league for the National Hockey League.

other while within the actors charge; (b) the actor's discontinuing his aid or protection, if by doing so he leaves the other in a worse position than when the actor took charge of him.

*Filter v. McCabe,* 733 A.2d 1274, 1277 (Pa.Super.1999), *appeal denied,* 563 Pa. 645, 758 A.2d 1200 (2000) (quoting *Karavas v. Poulos,* 381 Pa. 358, 113 A.2d 300 (1955)). In *McCabe,* the appellant fell and smacked his head on a concrete floor in the homeowner's basement. *Id.* at 1275. The homeowner assisted the appellant by waking him and placing him on the couch. The next day the appellant awoke in the morning and proceeded home. *Id.* The homeowner called the appellant's home to see if he had made it home safely. When the homeowner spoke to the appellant's wife she told him that her husband was sleeping, the homeowner, however, did not inform the appellant's wife that her husband had been knocked unconscious the previous night. The homeowner called again an hour later, at which time he informed the appellant's wife of the fall. The appellant was rushed to the hospital but had already suffered permanent brain damage. *Id.* The trial court dismissed the appellant's complaint. This Court reversed the trial court and reinstated the complaint. *Id.* at 1279. This Court held that because the homeowner had taken steps to assist the appellant once he was injured, he had a duty to do so in a reasonable manner consistent with § 324 of the Restatement (Second) of Torts. *Id.* at 1278.

■ ¶ 21 Instantly, Appellant has presented no facts to support his claim that Appellees assumed a duty to protect him as described by Section 324 of the Restatement (Second) of Torts. Instead, the record shows Appellant voluntarily took his seat at the Spectrum, as he had so many times in the past. The Spectrum's hockey

configuration had not changed in any way since Appellant's previous visits. Appellees did not take charge of Appellant once he entered the facility, and there is nothing to indicate that Appellant was incapable of taking care of himself.

■ ¶ 22 Under Appellant's analysis, sports arenas that provide any form of protection between the playing field and the fans, automatically assume a duty to provide sufficient protection so that no fan will ever come into contact with any element of the game. According to Appellant's reasoning, a failure to do so makes sports arenas potentially liable each time a ball (or puck) enters the spectators seating area. The law of this jurisdiction, however, does not impose such a duty on the owners and operators of sports facilities. *See Jones, supra; Telega, supra; Pestalozzi, supra.* Appellant's assertion that Appellees assumed a duty to protect him is not tenable under prevailing law.

¶ 23 In his third issue Appellant claims that the trial court improperly relied on the assumption of the risk defense in granting Appellees' motion for summary judgment. Appellant asserts that the trial court erroneously intermingled the "assumption of the risk" doctrine with the "no duty" rule. Appellant concludes that the trial court's reliance on the "assumption of the risk" doctrine constitutes reversible error. We disagree.

¶ 24 In the trial court opinion, the court states that Appellant, by regularly attending the hockey games, "assumed the risk" of being hit with a puck. (Trial Court Opinion at 4). Here, the court did not use the phrase, in its legal sense, as dispositive of its decision. Essentially the trial court opined that, because operators of a hockey facility have "no duty" to protect spectators from the inherent risks of the game, each spectator assumes the risk of being hit by a puck. (*Id.*) The trial court did not,

in any way, rely on, or even address the "assumption of the risk" doctrine in granting Appellees' motion for summary judgment. We conclude, therefore, that the trial court properly relied on the "no duty" rule as previously discussed. Accordingly, Appellant's third issue is belied by the trial court's direct expression.

¶ 25 Finally, Appellant argues that the trial court improperly granted Appellees' motion for summary judgment, where the court had previously denied Appellees' motion for judgment on the pleadings. Appellant asserts that the trial court's denial of Appellees' motion for judgment on the pleadings established the "law of the case." Appellant further asserts that Appellees' motion for summary judgment argued the same issues as its previous motion for judgment on the pleadings, and added no additional evidence or case law. Appellant concludes that the trial court, therefore, was precluded from granting Appellees' motion for summary judgment. (Appellant's Brief at 19–22). We disagree.

■■■■ ¶ 26 The "coordinate jurisdiction rule" generally states "that judges of coordinate jurisdiction, sitting in the same court cannot overrule each other's decisions." *Domineck v. Mercy Hosp. of Pittsburgh,* 449 Pa.Super. 313, 673 A.2d 959, 960 (1996) (citing *Okkerse v. Howe,* 521 Pa. 509, 556 A.2d 827 (1989)). The coordinate jurisdiction rule technically applies to different judges on the same court ruling on an individual case. *Domineck, supra.* Well-settled Pennsylvania law states:

> The purpose of this rule is to ensure a degree of pretrial finality so that judicial economy and efficiency can be maintained. **However, the rule is not intended to preclude granting summary judgment following the denial of pre-**

**liminary objections**. The failure to present a cause of action upon which relief may be granted may be raised at any time. A motion for summary judgment is based not only upon the averments of the pleadings but may also consider discovery depositions, answers to interrogatories, admissions and affidavits. We can discern no reason for prohibiting the consideration and granting of a summary judgment if the record as it then stands warrants such action.

*Salerno v. Philadelphia Newspapers, Inc.,* 377 Pa.Super. 83, 546 A.2d 1168, 1170 (1988) (internal citations and quotations omitted) (emphasis added). Moreover:

> Where motions differ in kind, as preliminary objections differ from motions for judgment on the pleadings, which differ from summary judgment, a judge ruling on a later motion is not precluded from granting relief although another judge has denied an earlier motion. However, a later motion should not be entertained or granted when a motion of the same kind has previously been denied, unless intervening changes in the facts or law clearly warrant a new look at the question.

*Abbott v. Anchor Glass Container Corp.,* 758 A.2d 1219, 1222–23 (Pa.Super.2000) (quoting *Goldey v. Trustees of the University of Pennsylvania,* 544 Pa. 150, 155–56, 675 A.2d 264, 267 (1996)). A court of coordinate jurisdiction, therefore, may properly grant a motion for summary judgment after a previous motion for judgment on the pleadings has been denied. *Austin J. Richards, Inc., v. McClafferty,* 371 Pa.Super. 269, 538 A.2d 11, *appeal denied,* 520 Pa. 570, 549 A.2d 131 (1988).

■■■ ¶ 27 In the present case, the **same** judge [6] ruled on both Appellees' motion for

---

6. At oral argument a question arose as to whether the same judge issued the rulings on

judgment on the pleadings and Appellees' motion for summary judgment. We fail to see how the coordinate jurisdiction rule works to prevent the same judge from granting a motion for summary judgment after previously denying a motion for judgment on the pleading, where the rule does not preclude a judge from doing so after another judge has previously denied a motion for judgment on the pleadings. *See Austin J. Richards, Inc., supra.* In addition, Appellant concedes that a motion for summary judgment and a motion for judgment on the pleadings are "not generally of the same kind." (Appellant's Brief at 20). *See also Abbott, supra.* Hence, the coordinate jurisdiction rule does not necessarily prevent the same judge from ruling favorably on a motion for summary judgment in a case where he has previously denied a motion for judgment on the pleadings. *See Austin J. Richards, Inc.*

¶ 28 When the trial court denied Appellees' motion for judgment on the pleadings it had only the complaint and answer on which to base its decision. Contrary to Appellant's assertion, the trial court had a plethora of new information when it considered the parties' motions for summary judgment. The record contains depositions, answers, admissions, the ASTM guide for hockey facilities, the A.H.L. Official Rulebook, and the opinion of Appellant's expert, Steve Bernheim, all of which were available to the trial court when it considered Appellees' motion for summary judgment. The benefit of this additional information, particularly the ASTM Standards, the opinion of Appellant's expert, and the A.H.L. rules, made clear Appellees did not have a duty to protect Appellant under the circumstances. *See Pestalozzi, supra; See also Jones, supra.* Hence, Ap-

pellees owed Appellant no duty of care; therefore, no action in negligence could lie against Appellees. *See Martin, supra.* Further, the trial properly found that no genuine issue of material fact existed as to the no-duty rule, and that Appellees were entitled to judgment as a matter of law. *See* Pa.R.C.P. § 1035.2. The trial court's grant of Appellees' motion for summary judgment after previously denying Appellees' motion for judgment on the pleadings, therefore, was appropriate. *See Austin J. Richards, Inc., supra.*

¶ 29 Based upon the foregoing, we hold that Appellees had "no duty" to protect Appellant from an errant puck entering the spectators' seating area, as such instances are a common, frequent, and expected occurrence at a hockey game; the Spectrum hockey facility did not deviate from any established custom of safety that would give rise to liability for the injuries sustained by Appellant; Appellees did not assume a duty to protect Appellant merely by erecting a plexiglass shield around the ice surface; and the trial court did not improperly rely on the "assumption of the risk" defense in granting Appellees' motion for summary judgment. Finally, we hold that it was proper for the trial court to grant Appellees' motion for summary judgment although it had previously denied Appellees' motion for judgment on the pleadings. Accordingly, we affirm the trial court's order granting Appellees' motion for summary judgment.

¶ 30 Order entering summary judgment affirmed.

---

Appellees' motion for judgment on the pleadings and their motion for summary judgment. A review of the record indicates that Judge Myrna Field ruled on both motions. (*See*

Order dated July 12, 2000, denying Appellees' motion for judgment on the pleadings, and Order dated January 10, 2001, granting Appellees' motion for summary judgment).